229 P.3d 761 (2010)
Janet CARLISLE, Robert Armstrong, Kent Bell, Kelly Brazil, Dawn Brackensick, Steven Brackensick, Johan Curtiss, Michael Curtiss, Gary Ford, Melinda Ford, William Gabel, Alfred Garcia, Clifford Hampton, Erika Harlow, Bill Huebner, Eugene Juteau, Connie Krull, Colleen Miller, Kenneth Miller, Steven Myrick, Heidi Newsome, Todd Newsome, Craig Nighswonger, Michael Prather, Joseph Praino, Mark Repko, Laura Springer, Lindsay Wagner, Tyler Wagner, Allison Walsh, Tom Walsh, Daniel Wandler, Shelly Wandler, Richard Zelmer, Appellants,
v.
COLUMBIA IRRIGATION DISTRICT, a municipal corporation, Respondent.
No. 82035-0.
Supreme Court of Washington, En Banc.
Argued May 28, 2009.
Decided April 1, 2010.
*763 John Stephen Ziobro, Telquist Ziobro McMillen, P.L.L.C., Richland, WA, for Appellants.
Terry Elgin Miller, Kennewick, WA, James Paul Wagner, Cairncross & Hempelmann, P.S., Seattle, WA, for Respondent.
FAIRHURST, J.
¶ 1 Irrigation districts in Washington, like all local government entities, must follow the statutes that regulate them, provide due process of law before depriving persons of property, and hold elections in a manner that is equal and free. The issue in this case is whether the Columbia Irrigation District (CID) met these obligations when it expanded its territory in 2007 and established a local improvement district (LID) to levy special assessments on the newly added properties. We hold CID acted lawfully, and accordingly we affirm the Benton County Superior Court.

Irrigation Districts
¶ 2 Irrigation districts are local government entities created and regulated according to the legislature's design. See Title 87 RCW. Their purpose is to construct and operate irrigation works. RCW 87.03.010.

*764 The add lands process

¶ 3 After an irrigation district has been established, its territory can grow beyond its initial boundaries, provided that the district follows the relevant statutory procedures. See RCW 87.03.560-.640. This "add lands" process, as it is known, begins by petition. RCW 87.03.560. If a group of petitioners seeks to add a "body of lands" rather than a single parcel, the petitioners must represent at least one-half of the land body's acreage. Id. The petitions must be in writing, describe the body of lands, describe the individual parcels owned by the petitioners, state that the petitioners hold title to these parcels, and declare the petitioners assent to their parcels being included in the district. Id.
¶ 4 Upon receiving the petitions, the irrigation district must publish a notice in a newspaper in the county where the district board of directors is located. RCW 87.03.200(1),.565. RCW 87.03.565 does not require personal notice or notice by mail. The published notice must give the time, date, and place for a public hearing on the action proposed in the petitions. Id. The notice must direct all interested parties to appear at the hearing and show cause in writing why the requested change in boundaries should not be made. Id.
¶ 5 The board has discretion to reject the petition. RCW 87.03.580. But if the district board thinks the expansion is in the district's best interests, the board may enter an order changing the district's boundaries to include the lands described in the petitionunless an interested party appears at the hearing and shows cause in writing why the board should not. Id. If there is such a written objection, and the board still thinks the expansion is in the district's best interests, the board may order a district-wide election on the proposal. RCW 87.03.585-.590. If a majority of the votes cast at the election rejects the boundary change, then the board must deny the petition; if a majority approves, the board must grant. RCW 87.03.595. When lands are added to the district, "such lands shall also become subject to all taxes and assessments of the district thereafter imposed." RCW 87.03.575.

LID formation and assessments
¶ 6 To pay the costs of "special construction, reconstruction, betterment or improvement or purchase or acquisition of improvements already constructed," RCW 87.03.480, an irrigation district's board of directors may initiate the process to form an LID, RCW 87.03.485. The board must adopt "a resolution specifying the lands proposed to be included... or by describing the exterior boundaries." Id. The resolution must describe "the proposed improvement" to be built and set a time and place for a public hearing on the matter. Id. The resolution must "state that unless a majority of the holders of title or of evidence of title to lands within the proposed local improvement district file their written protest at or before said hearing, consent to the improvement will be implied." Id. A copy of the resolution must be published and also mailed to owners of property within the proposed LID boundaries. Id. If, after a hearing, the district board decides to move forward with the improvement, "the board shall enter an order establishing the boundaries of the improvement district." RCW 87.03.490.
¶ 7 After the board establishes the LID, the irrigation district must pay for the improvement costs, operations, and maintenance by levying a special assessment on the LID properties "in proportion to the benefits accruing thereto." RCW 87.03.495. The levy and calculation of the assessments must be "in the manner provided by law for the levy and collection of land assessments or toll assessments." Id. If the LID properties are unable to pay any bonds sold to pay for the improvement, "the amount delinquent shall be paid by the general warrants of the irrigation district at large." RCW 87.03.500.

I. FACTUAL AND PROCEDURAL HISTORY
¶ 8 CID serves the Tri-Cities region with irrigation water.[1] The city of West *765 Richland considered establishing an LID to serve Belmont with water from new wells. At some juncture, however, the city started working with CID, which already served portions of West Richland with pressurized irrigation water, to expand to Belmont. CID had water rights but the Belmont lands did not. Because the Belmont lands had no water rights, CID proposed to reclassify the lands as irrigable and form an LID to assess the landowners for their share of the construction costs, operations, and maintenance of CID's system.

A. The add lands process
¶ 9 In September 2006, CID sent notice of an upcoming informational meeting about the add lands process. CID sent the notice to a list of Belmont area landowners, which CID staff compiled using the Benton County Assessor's records. The notice stated the date and place of the upcoming meeting, included a copy of a partially completed petition to add lands, and explained the petition.
¶ 10 At the meeting, the secretary of CID, Larry Fox, explained the benefits of belonging to CID, the process for adding lands and forming an LID, and the likely costs to the Belmont landowners. Fox's slide presentation indicated a deadline of "October 27th" for submitting petitions to CID (CID also sent a follow-up letter affirming the deadline of October 27). Clerk's Papers (CP) at 225. Fox's slide presentation stated that "[p]etitions will be submitted to the [CID] Board at their regular meeting on November 7th" and that "[i]f approved, the hearing will be scheduled for December 5th." Id. If CID added the Belmont lands, they would then be "eligible for a pressurized local improvement district with a water right." Id.
¶ 11 CID accepted petitions until November 7, 2006, but CID did not notify Belmont residents about the deadline change. Further, CID had no official administrative policies or procedures for processing petitions or verifying their validity. CID's process was informal. A CID staff member confirmed that the name of the signer matched the preprinted name at the top of the petition. No one checked the county assessor's database to see if the signer was still the holder of title to the land, even though a few months had passed since CID had originally compiled the list of landowners. For lands owned by business entities, CID required submission of the entity's documents on formation and governance as verification of the petition signer's authority. But CID did not have the appropriate documents from Swansons-Parsons, LLC, or AM Properties, LLC. Although Fox consulted with CID's legal counsel on the validity of petitions signed on behalf of those LLCs, Fox decided to forward the petitions to the board. No CID staff member alerted the CID board about any problem with any petitions.
¶ 12 At its regular monthly meeting on November 7, 2006, the CID board unanimously accepted petitions covering 276.67 acres within a 430-acre block of land. CID did not notify affected landowners or set a hearing date. On December 5, 2006, the CID board met, but did not hold a hearing, on the Belmont petitions, although Fox's slide presentation had indicated the hearing would be on that date. The CID board tentatively scheduled a hearing for February 2007. But no hearing took place that month. Instead, at its February 6, 2007, meeting, the CID board set a hearing for March 6, 2007.
¶ 13 As required by RCW 87.03.565, CID published a notice about the March 6, 2007, hearing in the classifieds section of the Tri-City Herald on February 17, February 24, and March 3, 2007. No statute required CID to send notice by mail or personally notify affected landowners, and CID did not do so. The published notice directed any interested person to appear at the public hearing on March 6, 2007, and show cause in writing why the boundaries of CID should not be changed.
¶ 14 At the hearing, no Belmont landowners came, and CID received no written objections to the boundary change. Because CID received no written objection, the CID board did not order an election. Rather, by unanimous vote, the CID board granted the petition and changed the CID boundaries to add the Belmont lands.

*766 B. CID forms an LID
¶ 15 On April 3, 2007, the CID board adopted a resolution declaring its intention to establish an LID in Belmont to build "improvements that benefit the area," including "a pump station, main line, reservoir and pressurization pump station, all connected to existing and new neighborhood or subdivision irrigation systems." CP at 231. The resolution stated, "The entire actual cost and expense of the Improvements, including costs of financing, shall be borne by and assessed against the property specially benefitted." CP at 232. The proposed LID boundaries were coextensive with newly added Belmont lands. On May 1, 2007, CID mailed a notice to owners of property within the proposed LID boundaries. The notice contained a copy of the board's LID resolution and a one-paragraph introduction stating the hearing time, date, and place, and explaining, "A question and answer session will be held, followed by a poll of those in attendance to determine if an LID should be formed." CP at 236. The notice instructed those who "are unable to attend [to] indicate your preference in writing and submit it to the District at the above address no later than May 10, 2007." Id. The resolution, included with the notice, contained an implied-consent statement complying with RCW 87.03.485: "Unless a majority of the holders of title or of evidence of title to lands within the LID file their written protest at or before the public hearing authorized by this resolution, consent to the Improvements will be implied." CP at 238. CID also published the notice in the Tri-City Herald on April 30 and May 7, 2007.
¶ 16 The CID board held the hearing for the LID on May 10, 2007, and staff distributed a handout detailing the LID costs, construction time lines, and financial information. The people who came to the hearing participated in a poll, as described in the hearing notice, and the CID board planned to review the poll results at its next meeting. At that meeting on June 5, 2007, several citizens attended to voice their concerns about the Belmont LID. The poll tallied 148 persons in opposition, 51 in favor, and 601 who said nothing and thus were counted as impliedly consenting to the formation of the LID. The CID decided to table its discussion. The board met again on June 19, 2007, and, by unanimous vote, decided to approve the LID.

C. The legal challenge
¶ 17 Thirty-four residents of Belmont (plaintiffs) filed suit in Benton County Superior Court, claiming that some of the add lands petitions were invalid and, as a result, the petition effort failed to meet the RCW 87.03.560 requirement that one-half of the Belmont land body's acreage be represented by the petition signers. Plaintiffs also brought facial and as-applied state constitutional challenges. They sought an order declaring that both proceedingsthe add lands process and the LID formationhad violated their right to due process under article I, section 3 of the Washington Constitution. They sought a declaration that RCW 87.03.560 and .485, two of the statutes followed by CID, were unconstitutional. The basis for plaintiffs' facial attack on RCW 87.03.560, although not explicit, was that it violated article I, section 3. They also argued that as applied to them, CID's implementation of RCW 87.03.560 violated due process because the notice of the board's add lands hearing was inadequate, and the procedures for validating petitions were too lax. As for RCW 87.03.485, the plaintiffs claimed the implied-consent provision allowed an unequal election and therefore violated article I, section 19 of the Washington Constitution. Finally, plaintiffs claimed that the notice of the LID formation hearing was constitutionally deficient.
¶ 18 The trial court granted CID's motion for summary judgment and dismissed the case. Plaintiffs appealed. The Court of Appeals, Division Three, certified the case to this court pursuant to RCW 2.06.030, and we accepted certification.

II. ISSUES
A. Did the addition of land to the CID deprive the plaintiffs of property without due process of law?
B. Did the CID expand without valid petitions representing one-half or more of the body of lands?
*767 C. Did the formation of the LID violate article I, section 19's guaranty of free and equal elections?
D. Did the notice of the hearing on forming the LID violate article I, section 3?

III. ANALYSIS

A. Did the addition of land to the CID deprive the plaintiffs of property without due process of law?
¶ 19 Article I, section 3 of the Washington Constitution provides, "No person shall be deprived of life, liberty, or property, without due process of law." The plaintiffs claim that CID violated their right to due process twice: first when CID processed the add lands petitions pursuant to RCW 87.03.560, and second when CID later gave notice by publication of the add lands hearing held on March 6, 2007.[2] Plaintiffs argue persuasively that CID's informal procedures for validating petitions resulted in irregularities, including the acceptance of petitions that should not have been accepted. And article I, section 3 strongly disfavors notice by publication. See Wenatchee Reclamation Dist. v. Mustell, 102 Wash.2d 721, 725-26, 684 P.2d 1275 (1984). But the protections of article I, section 3 apply only when a person has a protected interest in life, liberty, or property and suffers a government deprivation of that interest. See, e.g., Wash. Fed'n of State Employees v. State, 127 Wash.2d 544, 558, 901 P.2d 1028 (1995); Port of Tacoma v. Parosa, 52 Wash.2d 181, 193, 324 P.2d 438 (1958).
¶ 20 Article I, section 3 protects plaintiffs' real property interests. The remaining question is whether a deprivation of their property interests occurred during the petition and the hearing phases of the add lands process.

1. The definition of a deprivation

¶ 21 A deprivation is a "direct and adverse effect." Mustell, 102 Wash.2d at 725, 684 P.2d 1275. It is not a theoretical harm, nor is it an increased probability of harm. See Martinez v. California, 444 U.S. 277, 281, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980).[3] An injury that is "an indirect and incidental result" of lawful government action "does not amount to a deprivation." O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 787, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). Were it otherwise, the government would almost always be responsible for giving people notice and an opportunity to be heard before acting.
¶ 22 Even if a deprivation becomes more likely as a result of government action, due process does not apply if an actual deprivation is contingent on a subsequent action. This principle is illustrated by Chevron U.S.A., Inc. v. Puget Sound Growth Management Hearings Board, 156 Wash.2d 131, 124 P.3d 640 (2005). Chevron argued that it did not receive due process when the town of Woodway, without first notifying Chevron, designated Chevron's land in Snohomish County as a potential annexation area in accordance with the Growth Management Act, chapter 36.70A RCW. Chevron, 156 Wash.2d at 134-36, 124 P.3d 640. Woodway's designation of Chevron's land certainly made annexation more likely, and we acknowledged Woodway's action could have been direct because it uniquely targeted *768 Chevron's land. Id. at 138, 124 P.3d 640. But Chevron's claim was contingent. Chevron used its property in the same way it always had, no annexation in fact occurred, and Chevron would have the opportunity to object at a later proceeding if Woodway chose finally to annex the property. Id. On these facts, Woodway did not have to give Chevron individual notice, because Chevron could not "show how its property rights were actually affected." Id.
¶ 23 In another case where a deprivation was contingent on a subsequent action, Public Utility District No. 2 of Grant County v. North American Foreign Trade Zone Industries, LLC (NAFTZI), 159 Wash.2d 555, 570-71, 151 P.3d 176 (2007), we held a landowner was not entitled to constitutional due process in a condemnation proceeding until the judicial hearing. It did not matter that a resolution authorizing condemnation was adopted at a public meeting before the judicial hearing, thus making condemnation more likely, because an adopted resolution "does not result in a taking of property and does not deprive a property owner of any rights." Id. at 570, 151 P.3d 176. We recognized that "[t]he actual condemnation action does not occur until the judicial hearing." Id at 571, 151 P.3d 176. Thus, at the initial stagethe public meetingthe landowners suffered no deprivation cognizable under the law of due process.

2. Special assessments

¶ 24 "A special assessment is a charge imposed on property owners within a limited area to help pay the cost of a local improvement which specially benefits property within that area." Covell v. City of Seattle, 127 Wash.2d 874, 889, 905 P.2d 324 (1995). When the government constructs a public improvement, such as a road, a waterworks, or a park, the real properties nearest to the improvement can derive a benefit greater than the general public. Correspondingly, these properties increase in value. If the property receives a "special benefit," the government may levy an assessment. If the property does not, an assessment would be a deprivation of property without due process of law. Heavens v. King County Rural Library Dist., 66 Wash.2d 558, 564, 404 P.2d 453 (1965). Because a special benefit is the linchpin of an assessment's constitutionality, the owner of property subject to an assessment has the right to a hearing addressing whether the improvement resulted, or will result, in a special benefit to the property. See Parosa, 52 Wash.2d at 193, 324 P.2d 438. There is a concomitant right to notice of the hearing. Id.

3. Because no assessment occurred during the add lands process, no deprivation occurred

¶ 25 Applying the foregoing principles, we conclude the add lands process did not deprive the plaintiffs of property. Plaintiffs complain they were "subjected to a procedure whereby an unavoidable assessment will be applied to their property." Br. of Appellants at 18. But plaintiffs do not argue that CID actually levied an assessment. In fact, CID claims its practice was to wait to assess properties until an LID was formed, and plaintiffs do not contest this claim. A change in CID policy was a theoretical possibility, not a deprivation in fact. As with the alleged deprivations in Chevron and NAFTZI, an assessment levied on plaintiffs' properties was contingent on a subsequent action, namely the formation of an LID.
¶ 26 Still, plaintiffs argue that due process was required because CID obtained the authority to levy an assessment on their lands. To accept plaintiffs' argument, we would have to redefine a deprivation to mean the status of being subject to government authority. Implicitly, plaintiffs ask us to define "property rights" to include the freedom from a government entity having the authority to levy an assessment, regardless of whether that authority is actually used. We can find no support for this premise. The government's obtainment of legal authority to tax and levy assessments cannot cause a deprivation of property; only the government's exercise of this authority can. Thus, at the add lands phase, any harm to plaintiffs' property interests was inchoate and outside the bounds of article I, section 3. Plaintiffs endured no deprivation, and this defect *769 in the plaintiffs' due process argument is fatal to their claims.
¶ 27 We recognize that the courts in Drum v. University Place Water District, 144 Wash. 585, 258 P. 505 (1927) and Browning v. Hooper, 269 U.S. 396, 46 S.Ct. 141, 70 L.Ed. 330 (1926), struck down statutes permitting an LID to be formed by petition without notice to and a hearing for affected landowners. But the constitutional violation in both cases was the absence of notice and a hearing on the question of special benefits. In Drum, the plaintiffs' properties were added by petition to a water district even though they did not receive water service. 144 Wash. at 586, 258 P. 505. Plaintiffs were not entitled to notice or a hearing. Id. at 588, 258 P. 505. Similarly, in Browning, plaintiffs' properties were included by petition in a road improvement district. 269 U.S. at 400, 46 S.Ct. 141. The Browning Court suggested that no process would be due to landowners if a legislative body, as opposed to individual petitioners, had determined the question whether the properties would specially benefit from road improvements. Id. at 405, 46 S.Ct. 141. "But it is essential to due process of law that such owners be given notice and opportunity to be heard on that question [of special benefits] where, as here, the district was not created by the Legislature, and there has been no legislative determination that their property will be benefited by the local improvement." Id. We agree that property owners "have a right to have their property excluded if no benefit will result to it from the improvement." Parosa, 52 Wash.2d at 193, 324 P.2d 438 (emphasis added). But the constitutional defect in Drum and Browning was that the improvement districts sought to levy an assessment on the plaintiffs' properties without first giving them a hearing on the question of special benefits. Notice and a hearing are not required on the preliminary question of becoming a part of the district's territory. See 14 Eugene McQuillin, The Law of Municipal Corporations § 38:101, at 401-02 (3d rev. ed. 2008) ("There is no constitutional requirement that property owners be given notice of the creation of an improvement district.").[4]
¶ 28 Because due process of law entitled plaintiffs in this case to a hearing on the question of whether their properties would derive a special benefit from local improvements operated by CID, the plaintiffs might have a stronger case if CID had levied an assessment without an additional proceeding. But CID's assessment of the Belmont properties was contingent on the subsequent LID proceeding. And constitutional due process means only that the owner of property must be given notice and an opportunity to be heard at some point before the government levies an assessment on the property. See Pratt v. Water Dist. No. 79, 58 Wash.2d 420, 423-24, 363 P.2d 816 (1961); 14 McQuillin, supra, § 38:101, at 391-94. Article I, section 3 does not prescribe the exact day and hour for notice and a hearing; this process is due simply "before the assessments become irrevocably fixed," 14 McQuillin, supra, § 38:111, at 419-20, or "prior to a conclusive judgment," id. § 38:102, at 404.
¶ 29 Due process does not entitle a property owner to notice and a hearing on the decisions leading up to the assessment. If notice and a hearing preceded every government action, government would be paralyzed. Government decision making is often a multistep process, with several intermittent stages between the start of the process and the final decision. It is not practicable or necessary for notice and hearing to accompany every stage. This understanding of due process can be found in the United States Supreme Court's application of the Fourteenth Amendment to special assessments. As Justice Cardozo wrote for the Court in Utley v. City of St. Petersburg, 292 U.S. 106, 109, 54 S.Ct. 593, 78 L.Ed. 1155 (1934), "[t]here is no constitutional privilege to be heard in opposition at the launching of a project which may end in an assessment." In Utley, without notice or a hearing, the St. Petersburg, Florida city commission authorized construction of a street. Id. at 107-08, *770 54 S.Ct. 593. Over 16 months later, after the street construction project had been completed, the city commission published a notice and held a hearing on a plan to levy assessments on the properties adjacent to the street. Id. at 108, 54 S.Ct. 593. The Court concluded, "It is enough that a hearing is permitted before the imposition of the assessment as a charge upon the land." Id. at 109, 54 S.Ct. 593. As Utley makes clear, notice and a hearing do not necessarily have to precede a legal authorization that sets in motion a chain of events that ends in an assessment.[5]
¶ 30 We recognize the plaintiffs were in a weaker tactical position at the LID phase than during the add lands process. Under RCW 87.03.485, to withhold consent for an LID, a majority of title holders must object, whereas under RCW 87.03.585, a single objection during the add lands process triggers a district-wide election. Consequently, the addition of the plaintiffs' lands to CID increased the likelihood that an LID would form, resulting in an assessment on their properties. Still, due process is not concerned with the increased likelihood of a deprivation, as Chevron and NAFTZI make plain. An increased probability of an assessment was not a deprivation of property within the meaning of article I, section 3.
¶ 31 And we cannot think of any notion of property that would justify us holding that this procedural setback is a deprivation of property. Any attempt to portray plaintiffs' procedural rights during the add lands process as a constitutionally protected property interest would be a radical change in the law of due process. See, e.g., Olim v. Wakinekona, 461 U.S. 238, 250-51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) ("The State may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." (footnote omitted)); Curtis Ambulance of Fla., Inc. v. Bd. of County Comm'rs, 811 F.2d 1371, 1377 (10th Cir.1987) ("Courts generally agree that no property interest exists in a procedure itself, without more.").

4. The only process due was the procedures established by statute

¶ 32 Other than providing plaintiffs notice and a hearing on the special benefits question at some point before levying an assessment, CID was obligated under article I, section 3 only to follow the law set forth by the legislature. A settled rule of due process is that a democratically elected legislature has the prerogative to establish the procedures by which a local government entity is created or its boundaries expanded. A person does not have the constitutional right to notice, a hearing, or the right to object. See, e.g., Parosa, 52 Wash.2d at 193, 324 P.2d 438 ("[I]t is within the power of the legislature to authorize the inclusion of the property of nonconsenting owners."); Hunter v. City of Pittsburgh, 207 U.S. 161, 178-79, 28 S.Ct. 40, 52 L.Ed. 151 (1907) ("The state... at its pleasure, may ... expand or contract the territorial area, unite the whole or a part of it with another municipality, ... with or without the consent of the citizens."); Cherry v. City of Hayti Heights, 563 S.W.2d 72, 87 (Mo.1978) ("[T]he power to create a municipal corporation is a political function, resting solely in the legislative branch and not subject to due process requirements for notice."); Bd. of County Com'rs v. Sims, 252 Ind. 531, 535, 251 N.E.2d 9 (1969) ("[T]he legislature has jurisdiction over all of its instrumentalities, including municipal corporations, and may abolish, alter or incorporate such instrumentalities as it sees fit in the performance of its legislative functions. The legislature is not required to give notice to anyone affected by its legislation."). The process due when a municipal corporation forms or expands is by the grace of the *771 legislature, not by constitutional commandment.
¶ 33 In Parosa, a group of citizens claimed that the incorporation of a municipal corporation by petition deprived them of their property without due process of law. 52 Wash.2d at 192, 324 P.2d 438. They lamented that the petitioners for incorporation could set the boundaries arbitrarily, and the objecting citizens would have no process whereby they could exclude their land. Id. Rejecting their due process claim, we decided that when land is added to a municipal corporation's territory in accordance with a statute, "[n]o question of due process is involved." Id. at 193, 324 P.2d 438. The statutory conditions by which a municipal corporation's boundaries are set are a "political question, solely within the province of the legislature." Id. at 194, 324 P.2d 438.[6]
¶ 34 Consistent with Parosa, we hold that as long as the boundaries were set here in accordance with the pertinent statutes, article I, section 3 is satisfied. "[I]t is not for this court to say what additional standards would be desirable." Parosa, 52 Wash.2d at 194, 324 P.2d 438. Plaintiffs do not argue that the notice published in the Tri-City Herald breached RCW 87.03.565, that the CID board's resolutions failed to comply with chapter 87.03 RCW, or that CID committed any other statutory violation-except for improperly validating some petitions. To that issue we now turn.

B. Did the CID expand without valid petitions representing one-half or more of the body of lands?
¶ 35 RCW 87.03.560 specifies that petitioners who want their land added to an irrigation district must be "holders of title... representing one-half or more of any body of lands." Plaintiffs argue that CID erroneously accepted invalid petitions, and when these petitions are subtracted, the remaining petitions represented less than one-half of the Belmont land area. First, plaintiffs noted that Dennis Murphy of Hayden Enterprises signed 12 petitions encompassing 3.14 acres on November 6, 2006, after CID's posted deadline of October 27. 2006. Second, plaintiffs allege that of these 12 petitions signed by Murphy, 6 were for properties that had been sold to another person, totaling 1.57 acres. Third, plaintiffs claim that the petitions signed on behalf of Swanson-Parsons, LLC, and AM Properties, LLC, which together represented approximately 58.96 acres, were invalid because CID never received documents verifying the authority of each individual signer to act on behalf of each business entity. Fourth, they argue that seven petitions for properties totaling 1.83 acres, signed by Gregory and Carla Markel, cannot be counted because they were sold before the CID board officially acted on the petitions. If, as plaintiffs argue, the challenged petitions for property totaling 63.93 acres are excluded, then CID has petitions for only 212.37 acres of propertyjust slightly less than one-half of the 429.57 acres necessary.
¶ 36 Plaintiffs' argument fails for two reasons. First, they provide no support for their contention that the last category of petitionsthose signed by the landowner at the time and then later soldshould not be counted. The plain language of RCW 87.03.560 indicates that the assent of the title holder is necessary only at the time the petition is signed, the "petition must contain the assent of the petitioners to the inclusion within the district of the parcels or tracts of land described in the petition, and of which the petition alleges they are respectively the owners." (Emphasis added.) As long as the petition signer is the title holder at the time of signing, the petition is valid. The seven petitions for the Markel properties, encompassing 1.83 acres, are therefore valid.[7]
¶ 37 Second, plaintiffs do not explain how CID violated the statute by accepting petitions *772 after CID's October 27, 2006, deadline passed. No provision of chapter 87.03 RCW requires an irrigation district to impose a deadline for accepting petitions, and no provision explains the consequence of accepting a petition after a self-imposed deadline. Because the pertinent RCWs were silent on the matter, CID had discretion to set its own procedures for how to administer the add lands process. As long as the petitions were valid under the statute, the petitions were valid. Of the 12 petitions that Murphy signed on behalf of Hayden Enterprises, 6 for 1.57 acres were invalid because another person was the title holder at the time of the signature. But the remaining six for the other 1.57 acres were valid. Nothing in RCW 87.03.560 barred CID from accepting the petitions on November 6, 2006.
¶ 38 When the valid petitions from the Markels and Hayden Enterprises are counted, the total number of acres covered by valid petitions increases to 215.77. This is more than one-half of the total 429.57 acre block of land. After the petitions crossed this threshold, the validity of other petitions became irrelevant, and so we need not address the petitions offered on behalf of Swanson-Parsons, LLC, and AM Properties, LLC. Because CID received petitions from "holders of title ... representing one-half or more of any body of lands," CID complied with RCW 87.03.560.

C. Did the formation of the LID violate article I, section 19's guaranty of free and equal elections?
¶ 39 Article I, section 19 of the Washington Constitution provides, in relevant part, that "[a]ll Elections shall be free and equal." Invoking this guaranty, plaintiffs bring a facial attack on RCW 87.03.485, arguing that "RCW 87.03.485 cannot be construed in a manner that is free and equal." Br. of Appellants at 30. Plaintiffs note that RCW 87.03.485's implied-consent procedure can result in silence outweighing vocal dissentowners who file written objections to the add lands petition can be outnumbered by the owners who do nothingand thus impliedly consent. Plaintiffs argue this result is unequal because the "nonvotes" can override the "votes," and therefore the formation of the LID pursuant to RCW 87.03.485 was constitutionally deficient. But the express terms of article I, section 19 limit its application to "Elections," a term which is not defined in our state constitution and which we have yet to construe. The threshold question, therefore, is whether the LID-formation procedures set forth in RCW 87.03.485 call for an election within the meaning of article I, section 19.
¶ 40 We presume that a statute is constitutional, and plaintiffs bear the burden of establishing the unconstitutionality of the legislation beyond a reasonable doubt. Brower v. State, 137 Wash.2d 44, 52, 969 P.2d 42 (1998). Article I, section 19 provides procedural safeguards when there is an election, but it does not grant the substantive right to hold elections on all topics. "The provision does not mean that voters may go to the polls at any time and vote on any question they see fit." State v. Wilson, 137 Wash. 125, 132, 241 P. 970 (1925). Our cases recognize the principle that the right to free and equal elections arises "only at the stated times provided by the statutes relating to elections." Id. at 132, 241 P. 970.
¶ 41 When the legislature has wanted irrigation districts to conduct elections, the legislature has said so expressly, as indicated by many provisions of chapter 87.03 RCW. When a petition for a new irrigation district is submitted properly to the county board of commissioners, RCW 87.03.020 requires the county board to "order that an election be held ... for the purpose of determining whether or not the district shall be organized under the provisions of this act and for the purpose of electing directors." (Emphasis added.) Once formed, an irrigation district must be governed by a board of directors, RCW 87.03.020(4), and RCW 87.03.080 requires that "[a]n election of directors in an irrigation district shall be held on the second Tuesday of December of each year." (Emphasis added.) In the add lands process, if a person objects to a petition to add lands, the board may adopt a resolution deeming the boundary change to be in the best interest of the district, and then "the board shall order that an election be held within said district, *773 to determine whether the boundaries of the district shall be changed as mentioned in said resolution." RCW 87.03.590.
¶ 42 Unlike in these statutes, the implied-consent provision of RCW 87.03.485 says nothing about an election. Rather, it requires the board resolution proposing an LID to "state that unless a majority of the holders of title or of evidence of title to lands within the proposed local improvement district file their written protest at or before said hearing, consent to the improvement will be implied." RCW 87.03.485. The lack of an "election" label does not necessarily mean, of course, that this implied-consent procedure is not an election. But in substance, as in name, the procedure does not share the features of the irrigation district elections described elsewhere in chapter 87.03 RCW. There are two primary features of an election in an irrigation district. The first is the use of ballots. See RCW 87.03.075 ("Voting in an irrigation district shall be by ballot."). Second, the voters make the final decision on the issue put to an election.[8] In the add lands process, for example, a district board has discretion to accept or reject a petition to add lands, depending on whether the board believes the district's best interests will be served. See RCW 87.03.580. But if an add lands petition is put to a vote, the board must abide by the decision of the majority of voters. See RCW 87.03.595.
¶ 43 RCW 87.03.485 does not provide for an election. The implied-consent provision simply requires that the irrigation district board hold a public hearing after giving adequate notice to allow affected landowners to weigh in with their comments. There is no mention of an election. There is no discussion of ballots. While RCW 87.03.485 does permit a majority of affected landowners to object to the formation of the LID in writing, this statute does not specify expressly that the number of consenting or objecting landowners is determinative of the final outcome. Although this is a close question, we conclude RCW 87.03.485 does not call for an election. Thus, article I, section 19 does not apply to RCW 87.03.485.

D. Did the notice of the hearing on forming the LID violate article I, section 3?
¶ 44 Finally, the plaintiffs claim that the notice mailed to them regarding the May 10, 2007, hearing on forming the LID was constitutionally inadequate because the notice did not say that there would be an election. Instead, the notice said there would be a "poll." Because no election occurred, their argument fails.

IV. CONCLUSION
¶ 45 We recognize a special assessment is a deprivation of property within the meaning of article I, section 3's guaranty of due process. But the plaintiffs were entitled to notice only at some point in time before CID levies an assessment, not necessarily at the earlier stage when their lands were added to CID. At that earlier stage, CID only had to follow the statutes governing the add lands process, which CID did. Although some petitions may have been faulty, enough of them were valid. Finally, the formation of a local improvement district was not predicated on an election, and so the protection of voting rights in article I, section 19 did not apply. Because no election occurred, the notice that CID sent regarding the LID was sufficient. We affirm.
WE CONCUR: Chief Justice BARBARA A. MADSEN, Justice SUSAN OWENS, Justice CHARLES W. JOHNSON, Justice JAMES M. JOHNSON, Justice RICHARD B. SANDERS, Justice DEBRA L.
*774 STEPHENS, Justice TOM CHAMBERS, and KAREN G. SEINFELD, Justice Pro Tem.
NOTES
[1] This case comes to us after the trial court granted a motion for summary judgment, and so we view all facts and reasonable inferences from the facts in the light most favorable to the non-moving party. Sherman v. State, 128 Wash.2d 164, 183, 905 P.2d 355 (1995).
[2] Plaintiffs asked the trial court to strike down RCW 87.03.560 as unconstitutional on its face. "[A] successful facial challenge is one where no set of circumstances exists in which the statute, as currently written, can be constitutionally applied." City of Redmond v. Moore, 151 Wash.2d 664, 669, 91 P.3d 875 (2004). Plaintiffs have relinquished their facial attack on RCW 87.03.560, however, conceding in their brief that they "do not dispute the statute can conceivably be applied without violating the [d]ue [p]rocess clause." Br. of Appellants at 17. Plaintiffs also claim that CID applied RCW 87.03.560 in a manner that violated plaintiffs' right to due process. When the government applies a statute unconstitutionally, the application is void, but the statute remains in effect. Moore, 151 Wash.2d at 668-69, 91 P.3d 875.
[3] "Although not controlling, federal decisions regarding due process are afforded great weight due to the similarity of the language" between article I, section 3 and the Fourteenth Amendment to the United States Constitution. Rozner v. City of Bellevue, 116 Wash.2d 342, 351, 804 P.2d 24 (1991) (citing Petstel, Inc. v. County of King, 77 Wash.2d 144, 153, 459 P.2d 937 (1969); Bowman v. Waldt, 9 Wash.App. 562, 570, 513 P.2d 559 (1973)).
[4] In Drum, the court said that "in the organization of all municipal corporations the owners of land sought to be included within the territorial limits of the corporation must be given notice, and given an opportunity to be heard." 144 Wash. at 588, 258 P. 505. But in Parosa, we rejected this statement as invalid dictum. 52 Wash.2d at 193, 324 P.2d 438.
[5] See also a seminal federal due process case, Londoner v. City & County of Denver, 210 U.S. 373, 378, 28 S.Ct. 708, 52 L.Ed. 1103 (1908):

The proceedings, from the beginning up to and including the passage of the ordinance authorizing the work, did not include any assessment or necessitate any assessment, although they laid the foundation for an assessment, which might not subsequently be made. Clearly all this might be done without hearing to the landowners, provided a hearing upon the assessment itself is afforded.
[6] Because the legislature has the prerogative of establishing the process by which a local government entity forms or expands, the plaintiffs' real complaint is with the legislature's decision not to amend chapter 87.03 RCW. In contrast to the provisions of the irrigation district statute, the legislature has required notice to be given by mail when there is a petition to form a county road improvement district. See RCW 36.88.050.
[7] We need not decide in this case whether a petition can become stale if the district board does not act on it within a reasonable time.
[8] Other courts have also interpreted the word "elections" to mean the process by which voters make a final decision. See, e.g., Foster v. Love, 522 U.S. 67, 71, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (interpreting federal statutes implementing the elections clause of the United States Constitution and concluding "elections" means "the combined actions of voters and officials meant to make a final selection of an officeholder"); Vannatta v. Keisling, 324 Or. 514, 531, 931 P.2d 770 (1997) ("[W]e should construe `elections' to refer to those events immediately associated with the act of selecting a particular candidate or deciding whether to adopt or reject an initiated or referred measure.").