# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| HAMILTON CORNER I, LLC, | No.  49507-4-II |
| Appellant, | |
| v. | |
| CITY OF NAPAVINE, | PUBLISHED OPINION |
| Respondent. | |

WORSWICK, J. — Hamilton Corner I LLC, appeals from a superior court decision affirming the city council's confirmation of the city of Napavine's local improvement district (LID) assessment levied against Hamilton Corner's properties.  The assessment was for expansion of city water to an area not previously serviced by public water.  Among other improvements, the LID improvements included equipping a recently drilled city well (Well 6) with a pump, power, controls, and piping to connect the well to the city's water mains. However, the city later determined that the water from Well 6 was not suitable for drinking without additional improvements and currently could be used only for fire suppression.

Hamilton Corner argues that the city's current inability to use Well 6 for drinking water materially altered the LID as originally proposed, and thus, the assessment roll was founded upon a fundamentally wrong basis.  Hamilton Corner further argues that because the assessment roll was founded upon a fundamentally wrong basis, the city's appraisal of Hamilton Corner's properties was founded upon a fundamentally wrong basis, and thus, the council's decision to

No. 49507-4-II

confirm the assessments was arbitrary and capricious. We disagree and affirm the superior

court's decision.

FACTS

Hamilton Corner owns three properties relevant to this case, which are located in the city

of Napavine. In 2011, the city declared its intention to order the acquisition and construction of

certain water system improvements in the "Rush Road area," which included Hamilton Corner's

properties. The planned improvements aimed to expand the city water system to the Rush Road

area to promote development. The plan included connecting the public water system to a

recently drilled well, Well 6. The city's "Description of Improvements" described the

improvements as follows:

> Acquisition of a 12-inch water main, pressure reducing stations and fire hydrants,
> on Rush Road from Cedar Crest Street north to the Interstate 5 freeway interchange,
> and north on Hamilton Road to a point approximately 2,400 feet beyond the
> Interstate 5 freeway interchange; construction of additional 12-inch and 8-inch
> water main along Rush Road across the Interstate 5 freeway interchange,
> construction of 8-inch water main north on Rush Road from the Interstate 5
> interchange approximately 1,500 feet, and south from the Interstate 5 interchange
> along Kirkland Road and Bond Road approximately 1,800 feet; additional fire
> hydrants per City of Napavine by these water mains; equipping a recently drilled
> City well[1] with a pump, power, controls, and piping to connect well to
> aforementioned water mains; and construction of a new water reservoir for pressure
> control for the zone to be served by aforementioned water mains, including piping
> from the new water reservoir to aforementioned water mains; and associated work
> and appurtenances related to the above-described improvements.

Clerk's Papers (CP) at 76. The city adopted Resolution No. 11-12-34 giving notice of its intent

to establish LID No. 2011-1, which would implement the proposed improvements and provide

---

[1] This recently drilled well is Well 6.

2

payment for the improvements in part by special assessments upon the property within the district.

In February 2012, the city mailed notices of the LID formation hearing and preliminary assessments to the taxpayers of record as shown for the LID properties. After a public hearing, the city council adopted Ordinance No. 497, forming the LID and adopting the preliminary assessment roll in accordance with Resolution No. 11-12-34. For the next three years the city moved forward with its improvement plans.

During this time, the city discovered that the water from Well 6 was significantly discolored and thus failed to meet public health and city code requirements to be used as potable drinking water. While the city explored its options for correcting the Well 6 issue, the city moved forward with its improvement plans to otherwise bring public water to the Rush Road area, while reserving Well 6 water for fire suppression purposes until the discoloration was corrected.[2]

In 2012, the city acquired an appraisal of Hamilton Corner's properties in order to obtain an opinion as to the "before" and "after" market values of the properties and resulting special benefits, if any, relating to the LID, for purposes of establishing the properties' assessments. The appraisal was performed without any owner contact, and the properties were inspected only from the exterior and public areas.

Regarding the Hamilton properties, the appraisal noted that the primary difference between the "before" condition and the "after" condition would be that water would be provided

---

[2] Costs associated with resolving the discoloration issue are not included in the LID costs.

by an extension of the city's public water system as opposed to the properties' private well system. The completed public water system would allow for full development of the properties in accordance with the city's zoning and development standards, reduce system maintenance expenses, and lower property insurance rates. The appraisal concluded that "[t]he highest and best use is the continued use of the existing improvements for the foreseeable future, with the excess land of 19.43 acres suitable for additional commercial and industrial development upon extension of public water." Based on its investigation, the appraisal placed the "before" value of the Hamilton Corner properties at $3,440,000, and the "after" value at $3,760,000, for a total special benefit of $320,000. CP at 57.

On September 29, 2015, the city council published and mailed notices of public hearing for the LID final assessment roll to all property owners within the LID. Based on the appraisal, Hamilton Corner's three properties were assessed for a total $170,329.02, approximately half of the value of the special benefits to them, as calculated by the appraisal.[3] On October 27, 2015, Hamilton Corner sent a written objection to the assessment of its properties to the city council. That same day, the city began its public hearing on the assessments.

At the hearing, Hamilton Corner expressed its concerns to the city council. The council noted Hamilton Corner's protest and explained that while no water from Well 6 would be provided until the discoloration issue was resolved, a valve system allowed the city to nonetheless provide potable water to the area in the meantime. The council then continued the hearing to November 24, to allow time for the LID to prepare written responses to the protests received at the October 27 hearing. The council also encouraged Hamilton Corner to contact an

---

[3] Only 50 percent of the improvement project costs were funded by LID assessments.

4

independent appraiser, stating, "I would recommend that maybe what you should possibly look at doing is talking to an appraiser . . . and have them determine whether they feel there's benefit after the improvements to your property." Administrative Record (AR) at 155-56.

On November 19, legal counsel for the city responded to Hamilton Corner's letter explaining the cost of the improvement project. The letter also explained:

> A Benefit Study/Appraisal Report was prepared for your property in accordance with standard practices. The work was performed by an independent appraiser with expertise in special benefit assessments. The appraiser has worked throughout the State on LIDs. The City is unaware of any appraisals undertaken by qualified experts which contradict the conclusions reached by the City's expert.
>
> The City will not provide water that does not meet all public health requirements as well as the City's own stricter requirements. Water from Well 6 will not be placed into service until the discoloration issue is resolved. Costs associated with resolving this problem are not included in the LID costs.

CP at 70-71.

At the November 24 hearing, the council heard further testimony from protesting property owners and the city. At the hearing, Hamilton Corner had the opportunity to question the appraiser as to his appraisal methods and valuations. Of particular note were Hamilton Corner's concerns about what special benefits were being conferred on its properties since the properties were sufficiently serviced by their private water systems. The appraiser explained that under the city's zoning ordinances, the properties could not be further developed without being attached to a public water system, and that by bringing that infrastructure to the area, the properties' values increased commensurate with their increased ability to develop to their "highest and best use."[4] CP at 110.

---

[4] On appeal, Hamilton Corner criticizes the appraisal alleging it "failed to assign any value to Appellant's existing water system." Br. of Appellant at 31. However, the appraisal report explicitly acknowledged the properties' on-site private well system as serving its current use, but

Hamilton Corner did not present any valuation evidence of its own. After considering all the protests and evidence, the city council passed a motion to accept the final assessment roll without modification and adopted an ordinance to confirm the final assessment roll.[5]

Hamilton Corner then appealed the city council's decision to superior court, pursuant to RCW 35.44.210. The superior court affirmed the city council's decisions. Hamilton Corner now appeals to this court.

ANALYSIS

I. LEGAL PRINCIPLES

Local governments may impose special assessments on property owners within a local LID to pay for particular improvements that specially benefit those properties. *Hasit LLC v. City of Edgewood*, 179 Wn. App. 917, 933, 320 P.3d 163 (2014). Special benefit is "the increase in fair market value attributable to the local improvements." *Doolittle v. City of Everett*, 114 Wn.2d 88, 103, 786 P.2d 253 (1990). "To be subject to a LID assessment, a property must realize a benefit that is 'actual, physical and material . . . not merely speculative or conjectural.'" *Hasit*, 179 Wn. App. 933 (alteration in original) (quoting *Heavens v. King County Rural Library Dist.*, 66 Wn.2d 558, 563, 404 P.2d 453 (1965)). An assessment may not substantially exceed a property's special benefit. *Hasit*, 179 Wn. App. at 933.

_____

correctly noted that full development of the property could not be achieved without connecting to the public water system. The appraisal based the increased value on the value of the property with the potential to development.

[5] The improvements provided public water that met all public health and City requirements to the Hamilton Properties. Water from Well 6 was being reserved for fire flow until the discoloration issue could be remedied.

Affected owners have the right to a hearing as to whether the improvement resulted in special benefits to their properties. *Hasit*, 179 Wn. App. at 933. Parties may appeal a council's final assessment decision to the superior court. RCW 35.44.200. The superior court shall confirm the assessment decision, unless it finds "that such assessment is founded upon a fundamentally wrong basis and/or the decision of the council . . . was arbitrary or capricious." RCW 35.44.250.

An assessment is founded on a "fundamentally wrong basis" if there exists "'some error in the method of assessment or in the procedures used by the municipality, the nature of which is so fundamental as to necessitate a nullification of the entire LID, as opposed to a modification of the assessment as to particular property.'" *Abbenhaus v. City of Yakima*, 89 Wn.2d 855, 859, 576 P.2d 888 (1978) (quoting *Cammack v. City of Port Angeles*, 15 Wn. App. 188, 196, 548 P.2d 571 (1976)). "Arbitrary and capricious" refers to "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action." *Abbenhaus*, 89 Wn.2d at 858. And, "[w]here there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Abbenhaus*, 89 Wn. 2d at 858-59.

When reviewing a superior court's determination under RCW 35.44.250, our review is not an "independent consideration of the merits of the issue but rather a consideration and evaluation of the [city council's] decision-making process." *Abbenhaus*, 89 Wn.2d at 859-60. "Review is limited to the record of proceedings before the City Council." *Bellevue Assoc. v. City of Bellevue*, 108 Wn.2d 671, 674, 741 P.2d 993 (1987). We review the superior court's appellate

decision by applying the same "fundamentally wrong basis" and "arbitrary and capricious" standards of review directly to the council's decision.[6] *See* RCW 35.44.250.

We presume that the council's assessment decision was proper, and the party challenging the assessment bears the burden of overcoming this presumption. *Bellevue Assoc.*, 108 Wn.2d at 674. We also presume "'that an improvement is a benefit; that an assessment is no greater than the benefit; that an assessment is equal or ratable to an assessment upon other property similarly situated; and that the assessment is fair.'" *Abbenhaus*, 89 Wn.2d at 861 (quoting Philip A. Trautman, *Assessments in Washington*, 40 WASH. L. REV. 100, 118 (1965)). However, these presumptions merely establish which party bears the burden of going forward with evidence. *Hasit*, 179 Wn. App. at 935. When the opposing party presents credible evidence to rebut these presumptions, the burden shifts to the city to support its decision. *Hasit*, 179 Wn. App. at 935-36.

---

[6] Hamilton Corner dedicates portions of its brief to criticizing the superior court's reasoning and decision. Specifically, it assigns error to the superior court's decision "that Appellant needed to have first appealed the City's earlier establishment of the LID in order to challenge the subsequent LID Assessment amount imposed upon Appellant's properties, and that Appellant's arguments were moot." Br. of Appellant at ii. Hamilton Corner also argues that the superior court erred by commenting on the fact that Hamilton Corner is the only property owner within the LID appealing its assessment.

Even if the superior court erred in any of these respects, it does not affect our decision. Because we apply the same "fundamentally wrong basis" and "arbitrary and capricious" standards of review directly to the council's decision, we may affirm the council's assessment decision on any grounds supported by the record. *Sunde v. Tollet*, 2 Wn. App. 640, 643, 469 P.2d 212 (1970). Any alleged defects in the superior court's appellate decision are immaterial to our review of the council's decision.

## II. UNSUITABILITY OF WELL 6 FOR DRINKING WATER

Hamilton Corner argues that because Well 6 does not provide drinking water, the city's assessments included benefits not received by the property owners and was thus founded upon a fundamentally wrong basis, and therefore, the council's decision to confirm the assessments was arbitrary and capricious. The city responds that despite not using Well 6 for drinking water, the fundamental purpose of the LID improvements and its foundation for special benefits and assessments was accomplished, and consequently, the council's confirmation decision was not arbitrary and capricious. We agree with the city.

Hamilton Corner contends that because Well 6 is not being used for drinking water, the assessment requires Hamilton Corner to pay for benefits it is not receiving. However, the purpose of the LID improvements—expanding the public water system to the LID properties— has not changed and is being accomplished. As of December 2015, when the council confirmed the LID assessments, the improvements delivered public water that met all public health and city requirements to the assessed properties. The LID did not require water to be supplied specifically from Well 6. That the drinking water for Hamilton Corner is not currently supplied by Well 6 is not material because Hamilton Corner is receiving the special benefit of city water.[7]

---

[7] Hamilton Corner's focus on Well 6 on appeal misapprehends the purpose of the LID and Well 6's role within the improvement projects. The city established the LID to expand its public water system to an area not previously served by a public water system. Ordinance No. 497, which established the LID, detailed the specific improvements planned as part of the LID. The description included, among other improvements, "equipping [Well 6] with a pump, power, controls, and piping to connect [the] well to aforementioned water mains." CP at 76. However, the LID did not fund the water rights acquisition or the drilling of Well 6. Well 6 was funded and drilled prior to the city introducing the LID at issue here. *Connecting* Well 6 to the rest of the city's water system was merely one facet of the development plan.

Hamilton Corner analogizes this situation to that in *Hasit*, 179 Wn. App. at 938.  There, the city of Edgewood chose to install oversized sewer pipes in its new sewage system in order to have the capacity to serve future users outside the LID.  *Hasit*, 179 Wn. App. at 931, 940.  This court in *Hasit* held that the extra cost of oversized pipes were improperly financed through the LID assessments and consequently the assessments were made on a fundamentally wrong basis. *Hasit*, 179 Wn. App. at 941  The court explained that the City's choice forced the property owners to finance capacity with no special benefit to them now or ever, and as such exceeded the rules of LID assessments.  *Hasit*, 179 Wn. App. at 941 (citing *In re Shilshole Ave.*, 85 Wash. 522, 537, 148 P. 178 (1915) ("the basic principle and the very life of the doctrine of special assessments [is] that there can be no special assessment to pay for a thing which has conferred no special benefit upon the property assessed.")).  But *Hasit* is distinguishable.

Here, all of the LID improvements, including the equipment on Well 6, are designed to specially benefit the LID properties; there is no evidence of any benefit to properties outside the LID as there was in *Hasit*.  Also, the LID did not fund Well 6 other than connecting it to the rest of the public water system.

Insofar as the *connection* of Well 6 to the public water system was a part of the LID improvements,[8] Ordinance No. 497 stated, "The Improvements shall be in accordance with the plans and specifications therefor prepared by the City Engineer, and *may be modified* by the city council as long as such modification does not affect the purpose of the Improvements."  CP at 73

---

[8] The LID improvements included equipping Well 6 with a pump, power, controls, and piping to connect it to the city's water mains.

(emphasis added). The city did not modify the connection of Well 6 to the public water system. And, although water from Well 6 is not currently being used for drinking water, it is available for fire suppression purposes, which is a purpose noted in the Description of Improvements.[9] Although the current use of Well 6 water deviates from the city's original goal for Well 6, the LID provided only for the well's connection to the public water system, and that connection is still providing some special benefit to the LID properties via fire suppression, and the overall purpose of the LID—providing public water—is being otherwise accomplished. Therefore, Hamilton Corner is receiving the special benefits for which it was assessed, and the assessment was not founded upon a fundamentally wrong basis.

Hamilton Corner further contends that without drinking water from Well 6 specifically, Hamilton Corner's assessment exceeds the special benefits received, and therefore, the council's decision to confirm the assessment was arbitrary and capricious. However, Hamilton Corner fails to offer any evidence to support its argument. *See Hasit*, 179 Wn. App. at 935-36 (stating that the appellant bears the burden of overcoming the presumption that the assessment decision was correct). Hamilton Corner was assessed for $170,329.02, which is far less than the $320,000 in special benefits provided by the LID. Nothing in the record suggests that any portion of the special benefit related specifically to receiving drinking water from Well 6 as opposed to connecting with the public water delivery system generally. Hamilton Corner fails to show that the modified use of Well 6 rendered either the assessment or the special benefit inaccurate.

---

[9] Furthermore, nothing in the record suggests that Well 6 will *never* be used to service drinking water. "[C]ities may assess such costs before completion of the improvement." *Little Deli Marts, Inc. v. City of Kent*, 108 Wn. App. 1, 8, 32 P.3d 286 (2001). Insofar as the city hopes to eventually deliver drinking water from Well 6, the record shows that the city is working to correct the discoloration issue.

Because the special benefits provided by the LID were not materially altered by the modified use of water from Well 6, the assessments were not founded upon a fundamentally wrong basis and the city council's decision confirming the assessments was not arbitrary and capricious. We hold that Hamilton Corner's arguments based on Well 6 fail.

## III. APPRAISAL[10]

A.    *The Appraisal of Hamilton Corner's Properties Was Not Founded on a Fundamentally Wrong Basis*

Hamilton Corner also argues that the assessment must be set aside because the appraisal on which the city based its decision was founded on a fundamentally wrong basis, and as a result, the council's reliance on the appraisal in confirming the assessments was arbitrary and capricious. Hamilton Corner alleges several defects in the appraisal of its properties, including that the appraisal (1) did not consider the value of the properties' existing private water system and water rights, (2) was performed too far in advance of the final assessments, (3) relied on speculation that the properties would be developed, and (4) did not appraise Hamilton Corner's properties as individual parcels. We disagree.

As discussed above, we presume that the council's assessment decision was proper. *Bellevue Assoc.*, 108 Wn.2d at 674. Hamilton Corner bears the burden of overcoming this presumption. *Hasit*, 179 Wn. App. at 935-36. It fails to do so.

---

[10] Hamilton Corner contends that it need not present its own appraisal evidence to successfully challenge the assessment. We agree. Because it is clear that here the city council fully considered Hamilton Corner's concerns regarding the appraisal, we do not consider this issue further.

1. *Private Water System*

Hamilton Corner contends that the appraisal was improperly based on incomplete and inaccurate information, particularly because it failed to consider the value of Hamilton Corner's preexisting private water system. However, the appraisal expressly accounted for the properties' private water system and recognized that the system adequately provided for the properties' current use. The appraisal stated:

> The only difference in the "after" condition compared to the "before" condition is the property is now served by the public water system. The owner no longer has the cost and expense of the private water system nor the cost to extend the water system in order to develop the excess land or in the event of extreme failure of the private water system.

CP at 64. The appraisal did not improperly ignore the value of the properties' current water system, rather it recognized that, while the private system served its current needs, by connecting to public water the property's value would increase due to improved development opportunity.[11]

2. *Timing of Appraisal*

Hamilton Corner also suggests that the 2012 appraisal was completed too far in advance of the LID improvements. However, Hamilton Corner offers no authority to support its contention that an appraisal must be done closer to the completion of the LID improvements. Furthermore, Hamilton Corner offers no evidence suggesting that the time between the appraisal and the completion of the LID improvements rendered the initial valuations inaccurate.

---

[11] Hamilton Corner also contends that the appraisal failed to factor in the costs of public water connection fees and monthly water charges and how those additional expenses would affect tenant retention and income from leases. However, Hamilton Corner provides no authority or evidence to show that the appraisal's failure to explicitly consider these alleged costs demonstrated that the appraisal was founded on a fundamentally wrong basis.

3. *Future Development*

Hamilton Corner also contends that the appraisal improperly relied on the speculation that the property would be immediately developed.[12] The record does not support its contention. Rather, the appraisal noted that although the property is "well located for a combination of commercial and industrial developments," the lack of public water and current market conditions made a delay in such development highly likely. CP at 62. The appraisal explicitly stated:

> With the exception of the water system changes, the subject property remains similar in the "after" condition. With the completion of the LID project, the excess land is available for immediate development. As such, the highest and best use of the subject in the "after" condition is the *continued use* of the existing improvements *for the foreseeable future*, with the excess land of 19.43 acres suitable for additional commercial and industrial development.

CP at 64 (emphasis added).

The appraisal did not rely on speculation that the property would be immediately developed, rather it noted that such development would likely be delayed due to market conditions.[13] Furthermore, "[p]roperty cannot be relieved from the burden of a local improvement district assessment simply because the owner devotes it to a use which may not be specially benefitted by the local improvement". *Doolittle*, 114 Wn.2d 88, 93, 786 P.2d 253 (1990). Future uses to which the property is reasonably well adapted may be properly considered. *Doolittle*, 114 Wn.2d at 93.

---

[12] Hamilton Corner also questions the validity of the city regulation requiring connection to public water for further development. However, consideration of city regulations that directly influence the value of property are properly considered when estimating the special benefits of improvements to property. *Hasit*, 179 Wn. App. at 942.

[13] The appraisal relied on comparative property sales in the area to ascertain what a willing buyer would pay for such properties with public water and the potential for future development.

4. *Individual Parcels*

Hamilton Corner also argues that the appraisal improperly evaluated Hamilton Corner's three properties as one unified parcel. Hamilton Corner argues that "[t]his was exactly the fundamental error that rendered the appraisals incompetent in *Doolittle*." 114 Wn.2d at 106. Br. of Appellant at 38.

*Doolittle* involved four adjacent properties with a common owner. *Doolittle*, 114 Wn.2d at 91. The city created a LID to widen and improve a main road abutting the properties. *Doolittle*, 114 Wn.2d at 91. Three of the properties shared one commercial building while the fourth contained a separate commercial building. *Doolittle*, 114 Wn.2d at 91. Despite the properties' different uses, the city appraised and assessed all four lots as one single tract of land, concluding that the "highest and best use" of the properties would be one single large commercial building covering all four lots. *Doolittle*, 114 Wn.2d at 91-92. The property owner protested the assessment on the basis that the fourth lot should be considered as a separate and distinct appraisal unit from the other three lots, and she provided the city with valuation testimony to that effect. *Doolittle*, 114 Wn.2d at 92.

Our Supreme Court agreed with the property owner. The court explained that because the first three lots were improved and used together before the LID, a proper assessment would compare those three lots used together before the LID to the three lots used together after the LID. *Doolittle*, 114 Wn.2d at 103. But because the fourth lot was never used in combination with the other lots, to consider its increase in value in conjunction with the other lots would be to disregard the owner's actual use. *Doolittle*, 114 Wn.2d at 103. Thus, the court in *Doolittle* held it was improper for the appraiser to never consider existing use of the various lots but instead

base the after value on the premise that all existing improvements would be removed and the lots used as an integrated whole. 114 Wn.2d at 104-05.

*Doolittle* is distinguishable because the appraisal here did not consider the lots as one integrated whole. Unlike in *Doolittle*, the appraisal of Hamilton Corner's properties did not disregard the owner's actual use or improperly consider the three lots as one whole for the purpose of future development.[14] Rather, the appraisal expressly noted that the three lots held a variety of improvements and compared the before and after values of the properties according to their continued uses. The increased value of the property stemmed from the potential for future development but did not rest on the premise that any such development would require the integration of all three lots for a single purpose. Because the appraisal did not evaluate Hamilton Corner's three properties as one unified parcel, this argument fails.

B.      *Due Process*

Hamilton Corner also argues that the city violated due process by failing to provide Hamilton Corner meaningful notice or opportunity to be heard regarding the assessments and appraisal. We disagree.

Article I, section 3 of the Washington Constitution and the Fourteenth Amendment to the United States Constitution provide that no person shall be deprived of life, liberty, or property without due process of law. Due process protections apply only when a person has a protected interest in life, liberty, or property and suffers a government deprivation of that interest. *Carlisle v. Columbia Irr. Dist.*, 168 Wn.2d 555, 567, 229 P.3d 761 (2010). "Most constitutional

---

[14] We also note that Hamilton Corner never protested its assessments on this basis, unlike the property owner in *Doolittle*.

limitations on the taxing power do not apply to LID assessments because they serve merely as "'compensation paid by the property owner for the improved value'" of the benefited property. *Hasit*, 179 Wn. App. at 933 (quoting *Heavens*, 66 Wn.2d at 564.). However, an assessment against property which does not receive special benefits from the improvement constitutes a deprivation of property without due process of law. *Heavens*, 66 Wn.2d at 564.

At a minimum, due process requires reasonable notice to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Hasit*, 179 Wn. App. at 953. The particulars of what process is due vary according to the circumstances of a particular situation. *Hasit*, 179 Wn. App. at 953.

Hamilton Corner bases its due process argument in large part on what it characterizes as the city's late disclosure of the appraisal. However, Hamilton Corner provides no authority for its contention that the city was required to provide notice of the appraisal to Hamilton Corner beyond its notice of the amount of the proposed final assessment.[15] Hamilton Corner likens its situation to that in *Hasit* where this court held that the city of Edgewood violated property owners' due process rights by issuing notices of final assessments 15 days before the confirmation hearing. 179 Wn. App. at 954-958. However, *Hasit* differs significantly from our current case.

The holding in *Hasit* was based on the late disclosure of the amount of the final assessment, which left an insufficient amount of time for property owners to obtain their own appraisals. *See* 179 Wn. App. at 954-55. Here, the final assessment notices were sent a month in

---

[15] State law requires only that the city give at least 15-day notice of the assessment hearing. RCW 35.44.090; there is no similar requirement for any associated appraisal reports.

advance of the confirmation hearing. Importantly, unlike in *Hasit*, Hamilton Corner never requested a continuance of the confirmation hearing in order to obtain its own appraisal.

Moreover, in *Hasit*, the final assessments were over 300 percent more than the preliminary assessments sent to property owners three years prior. *See Hasit*, 179 Wn. App. at 955. In contrast, here the preliminary and final assessments differed by just 12 percent. Hence, this case is more akin to *Time Oil Co. v. City of Port Angeles*, 42 Wn. App. 473, 475-81, 712 P.2d 311 (1985), where the court reasoned that the difference between the preliminary and final assessments was small enough that the preliminary assessment effectively put Time Oil on formal notice of the assessment.

To the extent Hamilton Corner contends that the procedure of the confirmation hearing itself violated due process, its claim also fails. Hamilton Corner appears to suggest that the city misled Hamilton Corner when the city concluded the October 27 hearing and continued the discussion to November 24. However, the record does not support Hamilton Corner's characterization of events. At the end of the October 27 hearing the city stated:

> So what I will do is I'll recommend the council to *hold the hearing over* until the next council meeting a month from now, say the council meeting after next. That will allow us time to read these comments and protests and develop our staff report and recommendations for either modifying or accepting the assessment roll.

AR at 155 (emphasis added). On November 24, the city characterized the hearing as "a continuation of the Rush Road LID 2011-1." AR at 158.

Hamilton Corner contends that "[t]he City intentionally obstructed Appellant's ability to provide his own expert analysis, and prevented Appellant from having his own counsel cross-examine the testifying appraiser." Br. of Appellant at 44. Again, the record does not support

18

Hamilton Corner's characterization of events. At the conclusion of the October 27 hearing, the city explicitly encouraged Hamilton Corner to talk to an appraiser and get a second opinion as to whether the LID improvements benefited its property. This is in direct conflict with Hamilton Corner's contention on appeal that "it did not appear the City would allow new testimony or exhibits, from Hamilton Corner I LLC [at the November hearing]." Br. of Appellant at 43-44. Additionally, at the November 24 hearing the appraiser testified and Hamilton Corner asked him several questions about the procedure of the appraisal and its valuation.

Ultimately, Hamilton Corner had notice reasonably calculated under all the circumstances to afford it an opportunity to present its objections to the city in a meaningful manner. The procedures employed by the city did not violate the due process to which Hamilton Corner was entitled.

Affirmed.

_____
Worswick, J.

We concur:

_____
Bjorgen, C.J.

_____
Lee, J.