[No. 42842-3-II.   Division Two.   March 13, 2014.]

HASIT, LLC, *Respondent*, v. THE CITY OF EDGEWOOD (LOCAL IMPROVEMENT DISTRICT NO. 1), *Appellant*.

1999 STOKES FAMILY, LLC, ET AL., *Respondents*, v. THE CITY OF EDGEWOOD, *Appellant*.

ERIC DOCKEN PROPERTIES, LP, ET AL., *Respondents*, v. THE CITY OF EDGEWOOD (LOCAL IMPROVEMENT DISTRICT NO. 1), *Appellant*.

920

922

924

*Joseph Z. Lell* and *Wayne D. Tanaka* (of *Ogden Murphy Wallace PLLC*), for appellant.

*Margaret Y. Archer* (of *Gordon Thomas Honeywell LLP*) and *Carolyn A. Lake* (of *Goodstein Law Group PLLC*), for respondents.

¶1 BJORGEN, J. — The city of Edgewood (City) appeals from a superior court order remanding local improvement district (LID) assessments, levied against respondents' property, for further proceedings before a hearing examiner and the Edgewood City Council (Council). We hold that the assessments rested in part on a fundamentally wrong basis, that they were arbitrary and capricious, and that the nature of the notice and the inadequate time between it and the hearing deprived the respondents of the due process of law. Accordingly, we annul the assessments against respondents' properties.

## FACTS

¶2 The Council created LID no. 1 by ordinance in October 2008 in response to a petition from various property owners. The City, incorporated in 1996, had no sewer service, and its reliance on on-site septic systems limited potential for development in the area. The LID financed the construction of a $21,238,268 sewer system, imposing the entire cost on the owners of 161 parcels in a 312-acre area.

A portion of this cost resulted from the accommodation of flows from properties outside the LID that would connect to the system in the future. The contractor substantially completed the sewer system by March 2011, and the Council officially accepted the work by resolution on April 12, 2011.

## A. Calculation of the Assessments Based on "Special Benefits"

¶3 In October 2009 the City hired a professional appraisal firm, Macaulay & Associates, to estimate the increase in value accruing to each parcel due to the sewer project, characterized as each parcel's "special benefit."[1] Clerk's Papers (CP) at 1528. Macaulay was also charged with allocating the cost of the project among the LID parcel owners in proportion to those benefits. Between December 2010 and May 2011, Macaulay's certified appraisers prepared a "mass appraisal report," using a valuation date of May 10, 2011. CP at 1464.

¶4 The Macaulay report established general value ranges per square foot of land, both with and without the sewer project, for the various zoning categories in the LID. It also provided an estimated with- and without-sewer value for each parcel based on "highest and best use" and described the various methods, assumptions, and sources of information used. CP at 1464-1626. The report did not, however, provide actual appraisals of each parcel or the specific calculations used to arrive at the estimated values.

¶5 On May 9, 2011, amendments to the City's zoning ordinance substantially increased the density and building

---

[1] The report defines "special benefit" as follows:

a specific, measurable increase in value of certain real property in excess of enhancement to the general area (and benefitting the public at large) due to a public improvement project. It is measured as the difference, occurring by reason of the LID project, between the market value of each parcel studied, without the LID project and market value of the same parcel with the LID project completed and as of the same time frame.

CP at 1528.

heights allowed for most of the zoning designations in the LID. Macaulay used these zoning changes as a "major assumption" in estimating the with-sewer values of the LID parcels but did not consider the new zoning in estimating values without sewer. Macaulay made this distinction because the "zoning changes could not be implemented without the availability of sanitary sewer service." CP at 1532.

¶6  To calculate the recommended assessments, Macaulay divided the total cost of the sewer project by the combined special benefit estimate for all LID parcels, $28,818,000, then multiplied the resulting quotient, approximately 0.74, by the estimated special benefit to each parcel. As long as the estimates of value with and without sewer were reasonably accurate, this approach would as a matter of logic maintain proportionality among the assessments and ensure that no parcel's assessment exceeded its special benefit.

## B.   Public Hearing before the Examiner

¶7  The city manager sent property owners in the LID a letter dated April 20, 2011,[2] providing "general information" concerning the assessment roll confirmation process and informing them that they could object to the assessments at a public hearing planned for June 1, 2011. CP at 216-17. The letter informed owners that the purpose of the hearing was "to hear from individual property owners regarding their individual assessments" and cautioned that "[o]nly those property owners that have filed written objections . . . at or prior to the hearing . . . may testify." CP at 216. Although the letter stated that "[t]he hearing examiner will consider all written and oral testimony," it added that "[p]roperty owners must limit their testimony to (1) whether their property's benefit from the improvements is at least as high as the assessment on their property; and (2)

---

[2] The date actually appearing on the letter is April 20, 2010 and the City's brief also states that the City mailed the letter on that date. The context makes clear, however, that both instances are scriveners' errors.

whether their assessment is proportional to the assessments on other property in the LID." CP at 216.

¶8 On May 12, 2011, the City mailed an official notice of the proposed assessments to the LID parcel owners and made the Macaulay report available for inspection at city hall. The notice informed the owners of the specific amounts proposed to be assessed against their properties and invited them to attend the public hearing before a hearing examiner on the assessment roll scheduled for June 1, 2011.

¶9 The official notice again advised the owners that they had to submit any objections in writing by the June 1 hearing, and it also informed them, as required by statute, that any owner who submitted a written protest at or prior to the hearing could appeal the hearing examiner's recommendation to the Council. The notice also included an "information sheet" that contained the same language that appeared in the city manager's April 20 letter.

¶10 On May 27, 2011, respondent Docken requested a continuance on the grounds that the City's notice was defective. The City denied the request.

¶11 The examiner proceeded with the hearing as scheduled. Owners timely submitted 24 protests involving 41 LID parcels, and the examiner heard testimony from 16 owners or their representatives. Appraiser Robert Macaulay and an assistant appeared and answered questions from protestors, their attorneys, and the attorney representing the City. Respondents all timely submitted protests in writing.[3]

¶12 At the end of the hearing, the examiner stated that he would "leave the record open for one week for any written responses or closing argument [from the owners] to

---

[3] The respondents' protests appear in the record as follows: Eric Docken and Docken Properties LP; Enid and Edward Duncan; James and Patricia Schmidt and Darlene Masters, AKA the Brickhouse LLC and Ronald Acosta; George and Arlyn Skarich; Suelo Marina LLC (collectively Docken); 1999 Stokes Family LLC; and Ray and Eldean Rempel as Trustees for the Revocable Trust Agreement of Ray E. Rempel and Eldean B. Rempel.

the City's presentation, and then . . . an additional week [for the City] to respond to . . . the arguments." CP at 2257. The examiner specified that no new evidence could be submitted or made part of the record.

¶13 The examiner issued his report and recommendation to the Council on June 30, 2011. In making the recommendations, the examiner applied various presumptions in favor of the appraiser's proposed assessment roll:

A. The City's action in forming the LID and its assessments are correct.

B. A property owner challenging the assessment has the burden of proving its correctness.[4]

C. The City has acted legally and properly.

D. An improvement is a benefit to the property.

E. An assessment is no greater than the benefit.

F. An assessment is equal or ratable to an assessment upon other property similarly situated.

G. The assessment is fair.

CP at 56 (citing *Abbenhaus v. City of Yakima*, 89 Wn.2d 855, 576 P.2d 888 (1978)).

¶14 The examiner also stated that "[t]hose protesting an assessment have a heavy burden of proof," which he described as follows: "a party challenging a final assessment must present expert appraisal evidence that their property is either not benefitted by the improvement or that their assessment is not equal or ratable to assessments of other property similarly situated." CP at 57. The examiner then quoted at length from an opinion of Division Three of this court:

Even if the presumption of an assessment's validity is successfully rebutted, however, the objector must still show that the assessment was founded on a fundamentally wrong basis or

---

[4] The context makes clear that the examiner intended this to mean that the owners bore the burden of proving the proposed assessments *incorrect. See Abbenhaus v. City of Yakima*, 89 Wn.2d 855, 860-61, 576 P.2d 888 (1978).

was imposed arbitrarily or capriciously. . . . A city council proceeds on a fundamentally wrong basis if it uses a method of assessment so flawed that it necessitates a nullification of the entire LID. . . . An arbitrary and capricious action refers to legislative decisions (such as the decision of the council here) made willfully and unreasonably, without regard or consideration of facts or circumstances.

CP at 57 (alterations in original) (quoting *Kusky v. City of Goldendale*, 85 Wn. App. 493, 933 P.2d 430 (1997)).

¶15 Ultimately, the examiner concurred in the recommendations in a June 13 letter from Macaulay to reduce three assessments, and the examiner further recommended investigation of a claim made by one protestor that Macaulay had relied on incorrect zoning designations in its estimates. The examiner recommended rejecting all the other protests entirely.

## C. The Council's Confirmation of the Assessment Roll

¶16 The Council considered the examiner's recommendations and heard appeals from the protestors at a closed-record hearing on July 19, 2011. The Council had by ordinance limited argument to facts already in the record before the examiner, ultimately allowing three minutes' argument for each appeal. Ten owners, including all the respondents, timely submitted written appeals and appeared at the hearing either in person or through counsel.

¶17 After hearing the protestors' arguments and rebuttal from the attorney representing the City, the Council briefly discussed the issues raised in some of the appeals. The Council then voted on an ordinance to confirm the roll exactly as recommended by the examiner except for reductions to two additional assessments, but it failed to pass. After additional deliberations, mostly involving the financial consequences to the City of further delay, the Council held another vote on the same ordinance, this time passing it. The ordinance took effect August 1, 2011.

## D.   Appeal to the Superior Court

¶18  Nine protesting owners, including the respondents, timely appealed the Council's decision to Pierce County Superior Court pursuant to RCW 35.44.250, alleging both substantive defects in the appraiser's assessment and flaws in the protest procedures.[5] The court consolidated the cases and ultimately filed its decision on November 10, 2011. The court concluded that the City's procedures suffered from many defects, notably, that "the City's notice and advisement of the hearing set for June 1, 2011 [before the examiner] was so inadequate as to violate the appellants' right to a fair hearing." CP at 2843. The court remanded the matter "for a revised and de novo hearing and evidentiary process before the Hearing Examiner," requiring the examiner and the Council to provide specific procedural protections to the protestors on remand. CP at 2843-45.

¶19  The City timely appealed the superior court's decision. Respondent Docken timely cross appealed.

## ANALYSIS

¶20  Because this case involves a complex and specialized area of law, we set forth the relevant principles governing LID assessments in some detail before evaluating the property owners' claims.

## A.   LID Assessments in Washington

¶21  Within a local improvement or related district, local governments may impose special assessments on property owners to pay for certain improvements that specially benefit those properties. *Covell v. City of Seattle,*

---

[5] A 10th protestor, North Meridian Associates, sought to intervene in the matter in the court below, which motion that court denied as untimely. North Meridian appealed that decision, but we dismissed the appeal as untimely filed on the City's motion. Another protestor who had timely appealed its assessment in the superior court and in this court, Hasit LLC, agreed to voluntary dismissal with prejudice on a stipulated motion.

127 Wn.2d 874, 889, 905 P.2d 324 (1995). "Special benefit" is "the increase in fair market value attributable to the local improvements." *Doolittle v. City of Everett*, 114 Wn.2d 88, 103, 786 P.2d 253 (1990). Most constitutional limitations on the taxing power do not apply to LID assessments because they serve merely as "compensation paid by the property owner for the improved value" of the benefitted property. *Heavens v. King County Rural Library Dist.*, 66 Wn.2d 558, 564, 404 P.2d 453 (1965). Courts have long considered installation of sewers a valid purpose for such assessments. *Heavens*, 66 Wn.2d at 563.

¶22 An assessment against property which does not receive a special benefit from the improvement constitutes a "depriv[ation] . . . of property without due process of law." *Heavens*, 66 Wn.2d at 564. To be subject to an LID assessment, a property must realize a benefit that is "actual, physical and material[,] . . . not merely speculative or conjectural," and that is "substantially more intense than [the benefit] to the rest of the municipality." *Heavens*, 66 Wn.2d at 563. Consistent with this rule, a special assessment may not substantially exceed a property's special benefit. *In re Confirmation of Local Improvement No. 6097*, 52 Wn.2d 330, 333, 324 P.2d 1078 (1958). Furthermore, a property should not bear "proportionately more than its share" of the total assessment relative to other parcels in the LID. *Cammack v. Port Angeles*, 15 Wn. App. 188, 196, 548 P.2d 571 (1976) (citing *Sterling Realty Co. v. City of Bellevue*, 68 Wn.2d 760, 415 P.2d 627 (1966)). However, the requirement of proportionality does not mandate that all properties within an LID be assessed the same percentage of the special benefits received. *See Bellevue Assocs. v. City of Bellevue*, 108 Wn.2d 671, 678, 741 P.2d 993 (1987).

¶23 Because LID assessments involve a deprivation of property, affected owners have the right to a hearing as to whether the improvement resulted in special benefits to their properties and whether their assessments are proportionate, which necessarily includes the right to ad-

equate notice of the hearing. *Carlisle v. Columbia Irrig. Dist.*, 168 Wn.2d 555, 569-70, 229 P.3d 761 (2010). The LID statute specifies that cities must mail notices giving the time and place of the hearing to the affected owners "[a]t least fifteen days before" the hearing and publish the notice once a week for 2 consecutive weeks in the city's official newspaper, with the final publication at least 15 days prior to the hearing. RCW 35.44.090.

¶24 The city council may designate an officer to conduct hearings on proposed assessments. RCW 35.44-.070. The hearings officer considers all objections and evidence and makes a recommendation to the city council. The council, serving as a board of equalization, may either adopt or reject the officer's recommendations and may accept, revise, or reject the assessments in whole or in part. RCW 35.44.070, .080(2), (3).

¶25 The decision of the Council may be appealed to superior court. RCW 35.44.200. The court may "correct, change, modify, or annul the assessment insofar as it affects the property of the appellant" if it finds from the evidence that the "assessment is founded upon a fundamentally wrong basis and/or the decision of the council . . . was arbitrary or capricious." RCW 35.44.250. An assessment is founded on a fundamentally wrong basis where the method of assessment or the procedures used by the city involve " 'some error . . . , the nature of which is so fundamental as to necessitate a nullification of the entire LID, as opposed to a modification of the assessment as to particular property.' " *Abbenhaus*, 89 Wn.2d at 859. Even if a challenger establishes such a fundamental error, however, "the court is limited to nullification or modification only of those parcel assessments before it." *Abbenhaus*, 89 Wn.2d at 859. Courts

consider a municipality's decision regarding an LID assessment[6] arbitrary and capricious only if it constitutes

> willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.

*Abbenhaus*, 89 Wn.2d at 858-59. Courts may also annul an assessment if imposed through an unconstitutional procedure. *See Pratt v. Water Dist. No. 79*, 58 Wn.2d 420, 423, 363 P.2d 816 (1961).

¶26 In applying these standards, courts may consider only " 'the record of proceedings before the City Council.' " *Doolittle*, 114 Wn.2d at 93 (quoting *Bellevue Assocs.*, 108 Wn.2d at 674 (citing *Abbenhaus*, 89 Wn.2d at 859)). An owner challenging the assessment bears the burden of production, and the court will presume that the action of the city council was legal and proper. *Doolittle*, 114 Wn.2d at 93 (citing *Abbenhaus*, 89 Wn.2d at 860-61). Furthermore, a reviewing court must " 'presume[ ] that an improvement is a benefit; that an assessment is no greater than the benefit; that an assessment is equal or ratable to an assessment upon other property similarly situated; and that the assessment is fair.' " *Abbenhaus*, 89 Wn.2d at 861 (quoting Philip A. Trautman, *Assessments in Washington*, 40 WASH. L. REV. 100, 118 (1965)). Whether a property received a special benefit and the amount of the benefit ordinarily present questions of fact. *Bellevue Assocs.*, 108 Wn.2d at 676-77 (citing *In re Jones*, 52 Wn.2d 143, 146, 324 P.2d 259 (1958)).

¶27 These presumptions, however, merely " 'establish which party has the burden of going forward with evidence,' " and when " 'the other party adduces credible

---

[6] The difference in phrasing between "arbitrary *or* capricious" in RCW 35.44.250 and "arbitrary *and* capricious" in *Abbenhaus* and other case law is without significance.

evidence to the contrary,'" the burden shifts to the city. *Bellevue Plaza, Inc. v. City of Bellevue*, 121 Wn.2d 397, 403, 851 P.2d 662 (1993) (quoting *In re Indian Trail Trunk Sewer Sys.*, 35 Wn. App. 840, 843, 670 P.2d 675 (1983)). Thus, where a protesting owner alleges her assessment exceeds the special benefit and presents sufficient evidence to overcome the presumptions, but the city confirms the assessment roll regardless, a court will reduce or annul the assessment as arbitrary and capricious unless the city presented sufficient competent evidence to the contrary. *Bellevue Plaza*, 121 Wn.2d at 403-04.

## B. Procedural Defects in the Vote To Confirm the Assessment Roll Did Not Render the Resulting Ordinance Invalid

¶28 Respondent Docken argues that the ordinance confirming the assessment roll is void because the vote violated the council's own rules of procedure. Because a council member on the losing side of the initial vote made the motion to vote on the ordinance again, without a proper motion for reconsideration, it appears that the vote did, in fact, violate procedural rules. Edgewood City Council Rules of Procedure 6.17. This does not, however, invalidate the ordinance.

¶29 A well-established principle of the law governing municipal corporations is that "failure to conform to parliamentary usage will not invalidate [legislative] action when the requisite number of members has agreed to the particular measure." 4 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 13:63 (3d ed. 2011). Furthermore, a city council may suspend its own rules by implication. 4 MCQUILLIN, *supra*, at § 13:62. Had a member of the Council timely raised a point of order, it should have been sustained, but none did. Under these rules, the arguably improper reconsideration process does not invalidate the ordinance.

C.  The City Calculated the Assessments on a Fundamen-
    tally Wrong Basis by Including Costs for "Oversizing"
    the Sewer Pipes

1. The assessments were properly based on the entire cost
of the project, even though the improvements also provided
general benefits beyond the borders of the LID

¶30 Respondent Docken first argues that the as-
sessments are founded on a fundamentally wrong basis
because they cover the entire cost of the project, even
though the improvement will confer benefits on the broader
community outside the LID. In support Docken cites
*Bellevue Plaza*, 121 Wn.2d 397, which held that assessed
property must be specially benefitted by the improvements,
as distinguished from a general benefit to the entire district.

¶31 Nearly every conceivable improvement that confers
special benefits on nearby properties also confers some
present or future benefit to the community in general. This
is especially true of the health benefits from improved
sewer systems. The definition of "special benefit," one that
is "substantially more intense than [the benefit] to the rest
of the municipality," *Heavens*, 66 Wn.2d at 563, clearly
contemplates that the general public will also likely benefit
in some way from the improvement. Yet the statutory
default method of assessment, zone and termini, distributes
the entire cost of the project among specially benefitted
parcels. RCW 35.44.030, .040. With this, it can hardly be
said that requiring the specially benefitted parcels to bear
the entire cost proceeds on a fundamentally wrong basis
under the statute. Indeed, our Supreme Court rejected an
argument very similar to Docken's nearly a century ago:

> It is also claimed that the city council in assessing the entire
> cost of the improvement of a street which was a portion of an
> arterial highway, upon the abutting property within the ter-
> mini of the improvement, proceeded upon a fundamentally

wrong basis. . . . Since the statute authorizes the placing of the burden of the entire cost of the improvement upon the abutting property, it could not well be held that such an assessment was upon a fundamentally wrong basis, where the evidence shows that the property is not assessed for more than it is benefited.

*Moore v. City of Spokane*, 88 Wash. 203, 208, 152 P. 999 (1915). Docken's claim fails.

2. The assessments were improperly based on costs that resulted in a benefit only to future users not assessed under the LID

¶32 Docken also argues that the assessments rest on a fundamentally wrong basis because they include costs for "oversizing" the sewer pipes, which will benefit only future users not assessed under the LID. Br. of Resp't Docken at 46-53. We agree with this argument because the City's decision to oversize the sewer pipes presents a situation far different from the incidental general benefits that sewer improvements always confer on the community at large.

¶33 In keeping with the principle that special assessments serve as compensation for special benefits, *Heavens*, 66 Wn.2d at 564, our court has held that " 'only that portion of the cost of the local improvement which is of special benefit to the property can be levied against the property.' " *Bellevue Assocs.*, 108 Wn.2d at 676 (quoting *In re Schmitz*, 44 Wn.2d 429, 433, 268 P.2d 436 (1954)). This principle is well illustrated by *In re Shilshole Ave.*, 85 Wash. 522, 525, 148 P. 781 (1915), which held invalid an assessment levied for the purpose of raising the grade of a road by 16 to 18 feet because the evidence showed that the specially benefitted properties would have benefitted equally from an increase of only 9 feet. Assessments for the portion of the project that raised the street more than 9 feet, "being made against the property of these appellants to pay damages for a thing which did not benefit that property, was founded upon a fundamentally wrong basis and is wholly indefensible."

*Shilshole Ave.*, 85 Wash. at 536. The court emphasized that "the basic principle and the very life of the doctrine of special assessments [is] that there can be no special assessment to pay for a thing which has conferred no special benefit upon the property assessed." *Shilshole Ave.*, 85 Wash. at 537.

¶34 The same principle was more obliquely treated in *Morse v. Wise*, 37 Wn.2d 806, 226 P.2d 214 (1951). The city of Chelan decided to finance additions to its sewer system through rates and charges on all users, new and existing. *Morse*, 37 Wn.2d at 809. A number of existing users had paid special assessments to finance the portion of the system serving them. They objected to paying charges for new mains and laterals capable of serving only new users, arguing that they would be of no benefit to them. *Morse*, 37 Wn.2d at 809-10. The court upheld the charges as an exercise of the police power but noted that there would be merit to the appellants' contention "if the city had proceeded to make the improvements and construct a sewer system to serve the additional areas pursuant to local improvement statutes." *Morse*, 37 Wn.2d at 810-11.

¶35 More recently, our Supreme Court rejected an argument in *City of Seattle v. Rogers Clothing for Men, Inc.*, 114 Wn.2d 213, 227-28, 787 P.2d 39 (1990), that an LID assessment was invalid because the improvements at issue benefitted businesses not assessed. In upholding the assessment the court relied on the ground that the City "had apportioned the costs of programs between city funds and [LID] funds" and "had charged the Business Improvement Area funds only so much of the overall costs as the Downtown Seattle Association deemed to reflect activities that took place within, and advertising that benefit[t]ed," the assessed properties. *Rogers Clothing*, 114 Wn.2d at 227-28. This suggests that the City would have erred had it assessed against the LID owners the entire cost of improvements that admittedly accrued entirely to the benefit of others.

¶36 We recognize also that by their nature the legal standards governing special assessments are not applied with the precision of a jeweler's eye. For example, a special assessment may not *substantially* exceed a property's special benefit. *Local Improvement No. 6097*, 52 Wn.2d at 333. Property is to be assessed " 'as nearly as reasonably practicable in accordance with the special benefits gained by that parcel from the entire improvement.' " *Bellevue Assocs.*, 108 Wn.2d at 677 (quoting *Sterling Realty Co.*, 68 Wn.2d at 765). Proportionality does not require that all properties be assessed the same percentage of the special benefits received. *See Bellevue Assocs.*, 108 Wn.2d at 678. The flexibility in these principles acknowledges that the calculation of special benefit is not an entirely exact undertaking and that local governments cannot be held to an unrealistic standard of precision in doing so. A per se rule that condemned any excess capacity in a system funded by local assessments would be blind to these realities. The mere presence of any capacity over the bare minimum needed to serve the LID does not descend into illegality for that reason alone.

¶37 The City's decision here, however, does not fall within the reach of the flexibility granted by these principles. The record shows that the City deliberately built the pipes larger than was needed to serve the LID because it wanted to have capacity to serve future users outside the LID. The City had available other methods of financing this excess capacity, such as rates and charges consistent with *Morse*, 37 Wn.2d at 810-11, or latecomers' fees under RCW 35.91.020(b). The City spurned these methods and instead required property owners within the LID to pay for this excess capacity through their special assessments. The City's reasons for this choice may be excavated in the following exchange at the hearing:

[EXAMINER]: I just have one question. You said—when you talked about the latecomers agreement, you said you couldn't identify any method to do that. What did you mean by that?

MR. BOURNE: There are methods that have been used. If the—if the City was—was a robustly financed city and was old like the City of Seattle or Bellevue, then they could, perhaps, have a latecomers fee on future connections and we could upfront some of the money today, but the City does not have any money, and because the sewers are built in core one (phonetic) and there's not expected to be a lot of expansion in the near future, that really wouldn't earn much revenue anyway.

CP at 2237-38. In other words, the City rejected the other financing options because it did not have the money required initially and the future uses were not imminent. Its solution was to have the LID owners pay for capacity that would create no special benefit for them.

¶38 The City's approach does not represent the sort of flexibility demanded by the realities of local improvements. Rather, it attempts to finance capacity needed only to serve property outside the LID exclusively through special assessments on property within the LID. Even though the assessments remained less than the special benefits for each property owner, the choice by the City to make the owners finance capacity with no special benefits to them runs afoul of the rule in *In re Shilshole Avenue* and other decisions discussed above. In the absence of legislative authorization, the City cannot shift costs in this manner.

¶39 For these reasons, the assessments were made on a fundamentally wrong basis, as defined in *Abbenhaus*, 89 Wn.2d at 859. Consistently with *Abbenhaus*, we annul the respondents' assessments. 89 Wn.2d at 859.

### D. Macaulay Properly Considered Zoning Changes That Took Effect the Day before the Date of Its Appraisal

¶40 Respondents argue next that the assessments rested on a fundamentally wrong basis because Macaulay considered the increased density permitted by the zoning changes that became effective the day before its valuation date in estimating the value of properties with sewer

provided. We disagree. The zoning changes directly influenced the value of the properties with sewer, and the appraiser properly considered them for that purpose.

¶41 Respondents argue that consideration of the zoning change violates the rule expressed in *Doolittle* that the "measure of special benefits . . . is the increase in fair market value attributable to the local improvements." 114 Wn.2d at 103. Doolittle owned four contiguous lots, three of which were improved with one commercial use and the fourth with a separate commercial use. 114 Wn.2d at 90. The city's appraiser, in establishing the with-improvement value, assumed that all four lots would be combined and all existing improvements removed, thus increasing the overall square-foot value. *Doolittle*, 114 Wn.2d at 90, 92. The court held that this assumption constituted a fundamentally wrong basis for assessment because the increase in value would not be derived solely from the local improvements but from the improvements and the combination of the lots, with the owner's actual use disregarded. *Doolittle*, 114 Wn.2d at 103-04. This, the court held, would be inconsistent with the principle that the assessment be based on the special benefits resulting from the local improvements. *Doolittle*, 114 Wn.2d at 103-04.

¶42 Similarly, in *Bellevue Plaza*, 121 Wn.2d at 411-12, our Supreme Court invalidated an assessment based on various assumptions, including that the improvement would lead to properties joining into "superblocks" without regard to present use and that the improvement would allow owners to comply with a traffic ordinance that had not yet been implemented. The court specified that special benefits are limited to "the increase in the fair market value of a particular property caused by the improvements," which "cannot include a speculative value." *Bellevue Plaza*, 121 Wn.2d at 411.

¶43 The zoning changes considered by Macaulay, however, share none of the speculative nature of the assumptions held invalid in *Doolittle* and *Bellevue Plaza*. Both

opinions affirmed the principle that " 'future use to which property is reasonably adaptable within a reasonably foreseeable time is considered in determining the amount of special assessments.' " *Bellevue Plaza*, 121 Wn.2d at 413 (quoting *Doolittle*, 114 Wn.2d at 104). Zoning restrictions in large part fix the uses to which property will be legally adaptable. The zoning changes at issue here were adopted before the valuation date. Thus, the City would have erred if it had not considered these changes in estimating values with the sewer project in place.

¶44 Furthermore, the Macaulay report also stated that the absence of a sewer system precluded owners from developing their properties even to the maximum density permitted by the old zoning regulation. Thus, Macaulay properly considered the increased density only in the with-sewer valuation because owners could not have achieved even the previously allowed densities under the old zoning.

¶45 Macaulay properly considered the zoning amendments in the with-sewer valuations.

E. The City Showed That the Mass-Appraisal Method More Fairly Reflected the Special Benefits Than the "Zone and Termini" Method

¶46 Docken argues that the assessments rest on a fundamentally wrong basis because the City did not establish that Macaulay's mass-appraisal method more fairly reflected the special benefits than the zone and termini method set out in RCW 35.44.030-.045 Br. of Resp't Docken at 64 (citing *Sterling Realty Co.*, 68 Wn.2d at 766 in support). However, after *Sterling Realty* the legislature amended the statute to specify that

[n]otwithstanding the methods of assessment provided in RCW 35.44.030, 35.44.040 and 35.44.045, the city or town may use any other method or combination of methods to compute assessments which may be deemed to more fairly reflect the special benefits to the properties being assessed. *The failure of the council to specifically recite in its ordinance ordering the*

*improvement and creating the local improvement district that it will not use the zone and termini method of assessment shall not invalidate the use of any other method or methods of assessment.*

LAWS OF 1969, ch. 258, § 7 (codified as RCW 35.44.047) (additions italicized). A city need show only "slight evidence," if any, to meet this requirement. *Hansen v. Local Improvement Dist. No. 335*, 54 Wn. App. 257, 261-62, 773 P.2d 436 (1989). The record contains sufficient evidence to do so.

F.  The City's Confirmation of the Assessment Roll Was Arbitrary and Capricious

¶47 The owners contend that the City's actions in confirming the assessment roll were arbitrary and capricious in the ways discussed below. We agree with the owners in part.

1. The City denied the protests in part due to the absence of evidence that the City's notice prohibited the protestors from presenting

¶48 As noted above, the information sheet the City included with the official hearing notice, as well as the April 20 letter from the city manager, indicated that only property owners who had filed written objections would be allowed to speak or testify at the hearing. To state that only certain property owners "are allowed to speak at the hearing" plainly and literally means that only these property owners may testify at the hearing. In other words, the statement prohibits owners from bringing other witnesses, such as appraisers, to testify for them. It may be that the City intended to convey the notion that of the class of property owners, only those who have filed objections may testify, an interpretation more consistent with surrounding restrictions in RCW 35.44.080. That, however, is not what its communication said. A property owner not trained in the intricacies of LID law would likely have taken the City's

statement at face value: that she could testify only if she filed an objection but could not bring witnesses to testify on her behalf at the hearing or bring an attorney to speak on her behalf. Furthermore, it appears that the examiner never informed the protestors that they might call witnesses at the hearing. The City's attorneys, on the other hand, came prepared with four expert witnesses.

¶49 Yet the examiner relied heavily on the absence of expert testimony on behalf of the protestors in rejecting their challenges to the assessments. The examiner recommended, for example, that the Council reject 15 of the protests because none of those owners "submitted expert appraisal testimony or expert evidence to substantiate their protests." CP at 60-61. Indeed, the examiner explicitly based his ultimate conclusion that "the presumption of the validity of Macaulay's before and after assessments was not overcome" on the fact that "no appraiser appeared at the hearing and none of the written appraisals/appraiser statements established before and after LID values." CP at 67.

¶50 To deny the protests based on the protestors' failure to produce evidence that the City told them they could not present is unquestionably willful and unreasoning action, taken without regard to the facts and circumstances. Thus, under *Abbenhaus*, 89 Wn.2d at 858-59, the City's action was arbitrary and capricious. Although we appreciate the time, pressure, and financial constraints under which the Council acted, and do not doubt that the City attempted in good faith to follow the law, we find no room for a reasonable difference of opinion on this question.

2. The City erred in requiring protestors to submit expert appraisal evidence

¶51 Apart from the flaw in the notice just discussed, the City also erred in requiring protestors to present expert appraisal evidence demonstrating certain points. The examiner properly noted the following passage from *Cammack* establishing the central role of expert evidence in these proceedings:

"Expert evidence is clearly required to establish whether or not property is especially benefit[t]ed by an improvement and the extent of the benefit. Expert testimony also may be required to establish a disproportionate assessment."

CP at 57 (quoting *Cammack*, 15 Wn. App. at 197). The examiner interpreted this passage as follows:

Thus, a party challenging a final assessment must present expert appraisal evidence that their property is either not benefitted by the improvement or that their assessment is not equal or ratable to assessments of other property similarly situated.

CP at 57 (quotation marks omitted). However, neither precedent nor the plain meaning of the passage from *Cammack* imply the requirements that (1) the challenging party present the evidence, (2) the expert evidence be "appraisal evidence," or (3) that a party claiming disproportionate assessment "must" support the claim with such evidence.

¶52 With respect to the requirement that the protesting owner must present the evidence, we have explicitly rejected an argument that because certain protestors "failed to offer expert testimony at the city council hearing[,] the presumptions [in favor of the assessment] were still operative as to their property." *Indian Trail Trunk*, 35 Wn. App. at 843. On the contrary, in *Indian Trail* we held that "the burden of proving special benefit" shifted to the City because the protestors' parcels stood "in close proximity to the property on which expert testimony was given." 35 Wn. App. at 843-44. Thus, protestors plainly may benefit from expert evidence which they themselves did not present. The rejection of 15 of the protests because none of those owners "submitted . . . expert appraisal testimony or expert evidence [to] substantiat[e] their protest[s]" therefore rests on an erroneous application of the law. CP at 60-61.

¶53 Furthermore, the examiner told the protestors prior to hearing testimony that he "only need[ed] to hear it once

as far as the property is concerned" and "if someone covers . . . the reason you're here, you don't need to repeat." CP at 2135. The examiner subsequently reiterated that "if someone came and gave testimony or raised issues that would apply to everybody else, no one else needed to come forward to say it," specifically stating that he would apply "whatever is relevant in" respondent Docken's protest to his consideration of other protests. CP at 2135, 2180.

¶54 Next, the requirement that appraisal evidence be presented, including before and after values, is also erroneous. The *Doolittle* court sustained a challenge to an assessment despite holding that the protestor's "expert testimony as to increased valuation" was founded on an improper basis and thus inadmissible. 114 Wn.2d at 107. The court sustained the challenge because, even without the appraisal testimony, the protestor's expert established that the assessment was "clearly grounded upon a fundamentally wrong basis" due to an error in the method employed by the City's appraiser. *Doolittle*, 114 Wn.2d at 106. A property owner, then, need not necessarily present her own independent appraisal, or before and after values, to successfully challenge an LID assessment. *Doolittle* required only that some "[v]aluation testimony [be] presented to the Council." 114 Wn.2d at 106.

¶55 Finally, the requirement that even protestors alleging disproportionate assessment must present appraisal evidence runs counter to the plain meaning of the language quoted above from *Cammack*. That opinion's observation that expert evidence "may be required to establish a disproportionate assessment," *Cammack*, 15 Wn. App. at 197, does not mean that a protestor must present expert appraisal for that purpose. It means simply that the necessity for such evidence depends on the circumstances of the challenge.

¶56 The requirement that each protestor present expert appraisal evidence is contrary to governing law. As such, it counts as arbitrary and capricious action under *Abbenhaus*, 89 Wn.2d at 858-59.

**3. The City erred in requiring protestors to prove that assessments were founded on a fundamentally wrong basis or were imposed arbitrarily or capriciously**

¶57 Relying on *Kusky v. City of Goldendale*, 85 Wn. App. 493, 933 P.2d 430 (1997), the examiner required that those challenging an assessment show that it was founded on a fundamentally wrong basis or was imposed arbitrarily or capriciously. Under both statutory and case law, though, these standards apply at the stage of judicial review, not to the hearing before the examiner.

¶58 The fundamentally wrong basis and arbitrary and capricious standards are imposed in RCW 35.44.250, a statute governing assessment challenges at superior court. In pertinent part, this provision requires the court to confirm the assessment roll "unless the court shall find from the evidence that such assessment is founded upon a fundamentally wrong basis and/or the decision of the council or other legislative body thereon was arbitrary or capricious." RCW 35.44.250. Although this statute does not explicitly prohibit the City from applying these standards, its plain force is to direct superior court to apply them.

¶59 *Kusky* is wholly consistent with the view that these standards apply only to judicial review. Citing *Abbenhaus*, 89 Wn.2d at 860-61, and *Indian Trail*, 35 Wn. App. at 841, it cites the fundamentally wrong basis and arbitrary and capricious criteria in discussing the standards applied by the appellate court. *Kusky*, 85 Wn. App. at 498. Similarly, *Abbenhaus*, 89 Wn.2d at 860, and *Indian Trail*, 35 Wn. App. at 841, apply these standards only to appellate review.

¶60 One may argue, though, that if these heightened standards apply to judicial review of a city's decision, they also ought to apply to the route the city takes to that decision. This argument may shine on its surface but cannot withstand what the legislature has actually said about the process at the municipal level. When considering the assessment roll, the city council sits "as a board of equaliza-

tion." RCW 35.44.080(2). As such, the council or hearings officer "will consider the objections made and will correct, revise, raise, lower, change, or modify the roll or any part thereof or set aside the roll." RCW 35.44.080(3). A board of equalization presumes the value used by the county assessor to be correct, unless overcome by clear, cogent, and convincing evidence. WAC 458-14-046(4).

¶61 Since a council or hearings officer considering an assessment roll sits as a board of equalization, these provisions disclose legislative intent that it make de novo determinations while presuming the assessments to be correct, constrained perhaps by the clear, cogent, and convincing standard. The heightened presumption of correctness carried by the fundamentally wrong basis and arbitrary and capricious standards contradicts this legislatively mandated role. Further, applying these elevated standards at the municipal hearing would afford unwarranted deference to a report prepared under contract by a private appraisal firm. For these reasons, the City erred in applying the fundamentally wrong basis and arbitrary and capricious standards in making its decision on the assessment roll.[7]

4. With this decision on the standard of proof, it is unnecessary to determine whether the City erred in applying the remaining *Abbenhaus* presumptions

¶62 In reviewing a municipal decision on an assessment roll, the court must presume that the decision is correct, that the City has acted legally and properly, that the improvement is a benefit, that an assessment is no greater than the benefit, that an assessment is equal or ratable to an assessment on other property similarly situated, and that an assessment is fair. *Abbenhaus*, 89 Wn.2d at 860-61. Property owners contend that the Council's confirmation of

---

[7] These appeals do not require deciding whether the clear, cogent, and convincing standard for boards of equalization applies to municipal decisions on assessment rolls.

the assessment roll as recommended by the examiner was arbitrary and capricious because the examiner applied the presumptions articulated in *Abbenhaus* to the Macaulay report and imposed a heightened burden of proof.

¶63 We held above that the City erred by imposing heightened burdens of proof at its hearing through the fundamentally wrong basis and arbitrary and capricious standards. With that corrected, and with burden-shifting commanded by *Bellevue Plaza*, 121 Wn.2d at 404, and *Indian Trail*, 35 Wn. App. at 843, the extent to which the remaining *Abbenhaus* presumptions are used by municipal decision-makers may be a question of little consequence. In any event, it is not a question that must be confronted to resolve this appeal.

5. The alleged motives of certain city council members do not make the Council's decision arbitrary and capricious

¶64 Respondents claim that the Council's vote to confirm the assessment roll was arbitrary and capricious because (1) comments made by one council member indicated that he thought the protest procedures were unfair to the owners, (2) another member's remarks in support of a failed motion to reduce respondent Rempel's assessment indicated that he agreed the assessment was disproportionate, and (3) the Council's discussions leading up to the vote focused on the financial consequences to the City of delaying confirmation of the roll rather than the merits of the appeals. Because we may not consider such comments in evaluating the reasonableness of legislation, we reject this argument.

¶65 A well-established rule "governs a determination by a court of the reasonableness of an ordinance," and provides that

[e]xcept as they may be disclosed on the face of the act or are inferable from its operation, the courts will not inquire into the motives of legislators in passing or doing an act, where the legislators possess the power to pass or do the act and where

they exercise that power in a mode prescribed or authorized by the organic law. Therefore, neither the motives of the members of a municipal legislative body nor the influences under which they act can be shown to nullify an ordinance duly passed in legal form, within the scope of their powers. In such case, the doctrine is that the legislators are responsible only to the people who elect them.

5 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 16:89 (3d ed. 2013) (footnotes omitted).

¶66 Similarly, our Supreme Court has long held that courts "are not permitted to speculate on the motives prompting the city council in the enactment of the ordinance, so long as we find it reasonable upon its face and within the city's power." *Cont'l Baking Co. v. City of Mount Vernon*, 182 Wash. 68, 73, 44 P.2d 821 (1935). Thus, these comments and alleged motives of council members do not transmute the City's actions into arbitrary and capricious conduct.

6. Summary of holdings under arbitrary and capricious standard

¶67 In its approval of the assessment roll, the City erroneously used the fundamentally wrong basis and arbitrary and capricious standards, erroneously required protestors to submit expert appraisal evidence, and erroneously relied on the absence of evidence that the City's notice letter informed owners they could not present. We hold the Council's action in confirming the assessment roll under such circumstances to be arbitrary and capricious and annul the assessments imposed against respondents' properties.[8]

---

[8] We note that the court below remanded this matter to the City for further proceedings. In a challenge to an LID assessment, we review the decision of the municipality directly, not the decision of the superior court. *See Schmitt v. Cape George Sewer Dist. No. 1*, 61 Wn. App. 1, 809 P.2d 217 (1991). While we appreciate the superior court's attempt to remedy the defects in the City's process by fashioning a suitable remand order, the LID statute allows a reviewing court only

#### G. The City Violated Respondents' Due Process Rights

¶68 Having annulled the assessments on statutory grounds, we ordinarily would not reach the respondents' constitutional due process claims. *See Cary v. Mason County*, 173 Wn.2d 697, 703, 272 P.3d 194 (2012). In this case, however, we must reach the constitutional question. The respondents' cross appeal assigns error to the superior court's decision to limit relief to those owners who followed the statutory protest procedure, alleging that the City's notice and protest procedure infringed on the due process rights of all the property owners assessed under the LID, amounting to a "jurisdictional defect" that requires annulment of the entire assessment roll. Br. of Resp't Docken at 14-22. Thus, in order to determine the scope of relief, we must decide whether a due process violation occurred and, if so, whether it amounted to such a jurisdictional defect.

¶69 Because the notice was misleading and because the interval between its mailing and the hearing did not allow the owners sufficient time to obtain the type of evidence necessary to successfully challenge an LID assessment, we agree that the City denied the owners' due process right to a meaningful opportunity to be heard. We do not reach the question whether this is a jurisdictional defect, though, but instead dispose of the cross appellants' assignment of error on the ground that property owners other than the respondents have waived their due process challenges.

#### 1. Standard of review for due process claims

¶70 The Fourteenth Amendment to the federal constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Article I, section 3 of the Washington State Constitution similarly provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." We give

---

to "correct, change, modify, or annul the assessment insofar as it affects the property of the appellant." RCW 35.44.250.

" 'great weight' " to federal cases interpreting the Fourteenth Amendment when construing our constitution's due process provision. *Olympic Forest Prods., Inc. v. Chaussee Corp.*, 82 Wn.2d 418, 421-22, 511 P.2d 1002 (1973) (quoting *Petstel, Inc. v. County of King*, 77 Wn.2d 144, 153, 459 P.2d 937 (1969)). To the extent that it provides greater protection, of course, the federal provision controls. *Olympic Forest Prods.*, 82 Wn.2d at 422.

¶71 Although "the boundaries of the concept of due process are not capable of precise formulation," *Olympic Forest Prods.*, 82 Wn.2d at 422, at a minimum it requires "the opportunity to be heard," *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S. Ct. 779, 58 L. Ed. 1363 (1914), and "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). Thus, due process requires "notice and opportunity for hearing appropriate to the nature of the case" before a state deprives a person of "life, liberty or property." *Mullane*, 339 U.S. at 313. Furthermore, the opportunity "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965).

¶72 The particulars of what process is due "may vary according to the exigencies of the particular situation." *Olympic Forest Prods.*, 82 Wn.2d at 423. Thus,

> [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings. That the hearing required by due process is subject to waiver, and is not fixed in form[,] does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest . . . justifies postponing the hearing until after the event.

*Boddie v. Connecticut*, 401 U.S. 371, 378-79, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971) (footnotes omitted). Furthermore, a "procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." *Bell v. Burson*, 402 U.S. 535, 540, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971). "The procedural safeguards afforded in each situation should be tailored to the specific function to be served by them." *Olympic Forest Prods.*, 82 Wn.2d at 423 (citing *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970)).

2. The City failed to provide the owners with constitutionally adequate notice

¶73 As set out above, the City's "information sheet" misled the property owners as to what type of testimony they could present at the hearing by indicating that the only people who could speak at the hearing were owners who had timely submitted written protests. This likely worked to the owners' prejudice because, as discussed above, the examiner relied on the failure to present live expert testimony in recommending denial of most of the protests. When a notice bars a certain type of evidence, yet the subsequent decision relies on the absence of that evidence in denying relief, the notice cannot be said to have afforded individuals a meaningful opportunity to present their objections, as required by *Mullane*, 339 U.S. at 314. For this reason, the notice violated the due process clause.

¶74 Next, the City did not notify the owners sufficiently far in advance of the hearing to allow them time to obtain the kind of evidence necessary to challenge the assessments. The owners claim that the time between receipt of the notice from the City, mailed May 12, 2011, and the June 1 hearing was too short to obtain an appraisal. Respondent Enid Duncan, for example, stated at the hearing that due to "the short amount of time that we have" she had not yet obtained an appraisal of her property. CP at 2143. One council member acknowledged prior to the vote

to confirm the assessment roll that the time provided was "insufficient for anybody to be able to get an appraisal in a 15-day period of time in a commercial application."[9] CP at 2301. The attorney for the City responded that the property owners had known for three years that the project was in the works and that assessments would eventually be imposed.

¶75 The court in *Time Oil Co. v. City of Port Angeles*, 42 Wn. App. 473, 475, 481, 712 P.2d 311 (1985), expressed similar reasoning in refusing to hold arbitrary and capricious a city's denial of a continuance, requested for the purpose of obtaining an appraisal:

> The original assessment, received by Time Oil in November 1979, differed from the final assessment [of $20,133.32], received by Time Oil in April 1981, by less than $600; thus, Time Oil had been on formal notice of the assessment amount for almost 18 months. The council understandably was motivated to move the LID process to a conclusion. It considered the circumstances surrounding Time Oil's request; there was certainly room for two opinions concerning it.

¶76 In the present appeal the preliminary estimate of assessments, made at the formation of the LID, is not in the record. Respondents George and Arlyn Skarich, however, included a copy of their preliminary estimate with their protest to the examiner. Their final assessment of $51,022 exceeded the preliminary estimate of $16,515 by nearly $35,000. Because the final assessment before the *Time Oil* court differed from the preliminary assessment by less than five percent while the final assessments here amounted to as much as three times the preliminary assessments, the reasoning in *Time Oil* is inapposite.

[9] The record does disclose that one protestor, Pastor Stephan Janho of the Edgewood Bible Church, obtained a professional appraisal on May 31, 2011, that explicitly gave an opinion as to special benefit. That protest is not before us because the Council ultimately sustained it in part and Janho did not appeal. The fact that one protestor succeeded in obtaining an appraisal the day before the hearing does not establish that the owners had sufficient notice.

¶77 Furthermore, because Time Oil alleged no special benefit at all, the specific amount of the final assessment had little bearing on the need for evidence to substantiate its protest. In contrast, many of the protests here allege disproportionate assessment. Thus, the grounds for objection and the type of evidence necessary to support those objections would not have become apparent until after May 12, 2011, when the owners learned of the specific amounts assessed against their properties and had an opportunity to compare their assessments with those of their neighbors. Unlike in *Time Oil*, the short time period here between notice and the hearing effectively crippled many of the protests.

¶78 The City relies on its compliance with RCW 35.44-.090, which requires that the notice be sent only 15 days in advance of the hearing. Adherence to the requirements of state law, however, does not alone establish that a city's procedures for challenging LID assessments satisfy due process.[10] *Londoner v. City & County of Denver*, 210 U.S. 373, 386-87, 28 S. Ct. 708, 52 L. Ed. 1103 (1908); *see also Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (noting that " 'minimum [procedural] requirements [are] a matter of federal law[;] they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action' " (alterations in original) (quoting *Vitek v. Jones*, 445 U.S. 480, 491, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980)). Here, the grounds for a disproportionate assessment challenge would

---

[10] We also note that the legislature enacted the current 15-day notice period in 1929, long before the *Cammack* and *Abbenhaus* courts limited the scope of judicial review to the record created before the city council. LAWS OF 1929, ch. 97, § 3; *Abbenhaus*, 89 Wn.2d at 859-60; *Cammack*, 15 Wn. App. at 197-98. At that time, protestors could obtain a de novo hearing in superior court, at which they could present evidence not submitted to the city authorities. *See, e.g., In re Schmitz*, 44 Wn.2d 429, 432-33, 268 P.2d 436 (1954); Trautman, *supra*, at 128-29. Thus, because protestors who failed to persuade the city council would have additional time to adduce evidence in support of their challenges prior to the hearing in the superior court, the 15-day notice period posed much less of a constitutional problem then than it does today.

not have become clear until the owners actually knew the amounts of their assessments and those of their neighbors. Under those circumstances, due process at least required the City to allow sufficient time for the owners to obtain an expert appraisal and analysis of the assessment roll.

¶79 The constitutional problem is further exacerbated by the City's apparent failure to timely make available the information on which Macaulay relied in preparing parcel-specific value estimates. For example, respondent Docken stated that he did not receive parcel-specific information until the day of the hearing, and the information consisted of only one page, with no explanation of how the special benefits were calculated.

¶80 The City claims that it promptly provided all requested information. The record contains a May 18, 2011 e-mail from Edgewood Finance Director and City Clerk Janet Caviezel to respondent Duncan, informing Duncan as follows: "Mark Bauer forwarded me your request for the appraisal files for your property. I wanted to let you know that we are working on an estimated date to receive the files from Macaulay and Associates and will follow-up with a letter soon." CP at 1179. Thus it appears that less than two weeks prior to the hearing, interested property owners had not yet learned when they could expect to receive parcel-specific information concerning their assessments. At the June 1, 2011 hearing, Macaulay admitted that much of the information supporting his valuations of particular parcels did not appear in the report or the worksheets provided to the City, and that "we would have to do a report on it to really show you." CP at 2214-15.

¶81 Under the totality of the circumstances presented in this case, the owners did not have "notice reasonably calculated, under all the circumstances, to . . . afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. They faced a deprivation of property at the hands of the government, *Mullane*, 339 U.S. at 313, and were thus entitled to an opportunity to present their objections "at

a meaningful time and in a meaningful manner." *Armstrong*, 380 U.S. at 552. Instead, they received notice of large assessments against their property less than three weeks before the hearing. At least one assessment far exceeded the initial estimate and the time until the hearing did not reasonably suffice to obtain the type of evidence demanded at the hearing and necessary to mount a successful challenge in the courts. The notice, furthermore, misled them as to the type of evidence they could present. These procedures denied respondents the fair hearing to which due process entitles them.[11]

H.   Even If the Defects in the Notice Were Jurisdictional, Property Owners Other Than the Respondents Waived Their Challenges to Them

¶82   The owners allege that "cumulative due process and notice violations" resulting from the City's protest procedures amount to a "jurisdictional" defect that makes the entire "assessment roll null and void as to all LID property owners," not just those who timely protested and appealed. Br. of Resp't Docken at 15.

¶83   The violation of a constitutional right does not necessarily create a jurisdictional defect. *Tiffany Family Trust Corp. v. City of Kent*, 155 Wn.2d 225, 237 n.7, 119 P.3d 325 (2005). Instead, a jurisdictional defect is one going "to the underlying legality of the entire LID." *Tiffany*, 155 Wn.2d at 235-36. Our Supreme Court has found a jurisdictional defect when a city failed to give statutory notice of proceedings to confirm the assessment roll, when the improvement was not for public benefit, when improved

---

[11] The respondents' remaining due process arguments are not well taken. The rule in *Mullane* and related cases did not require the City to notify property owners of the legal standards the examiner would apply, such as the *Abbenhaus* presumptions and the heightened standard of proof discussed above. Respondents also point out that the ordinance appointing the examiner did not expressly authorize him to raise assessments, while the public notice and the governing statute did authorize the raising of assessment levels. While arguably confusing, this disparity had no effect on either the reasonableness of the notice or the meaningfulness of the opportunity to be heard.

property was not public property, and when the property was not subject to an LID assessment. *Tiffany*, 155 Wn.2d at 235. We strictly construe the concept of jurisdictional defect when deciding whether an error or defect falls within its scope. *Tiffany*, 155 Wn.2d at 236.

¶84 In *Tiffany*, the heart of the property owner's argument was that the City assessed a disproportionate amount against it. 155 Wn.2d at 233. The court held this would not constitute a jurisdictional defect because it would not mean that the entire LID was illegal and without basis. *Tiffany*, 155 Wn.2d at 237. Here, the misleading and temporally inadequate notice went to every property owner, not just those involved in this appeal. It consequently infected the entire LID, coming closer to a jurisdictional defect than the claimed error in *Tiffany*.

¶85 The defects claimed to be jurisdictional, though, are those of due process. A party may waive the due process right to a meaningful hearing by failing to timely raise it. *See Boddie*, 401 U.S. at 378-79 (noting that "the hearing required by due process is subject to waiver"); *Mellish v. Frog Mountain Pet Care*, 172 Wn.2d 208, 221, 257 P.3d 641 (2011) (holding that "Frog Mountain waived its [failure-of-notice] due process claim by failing to present it to the superior court"). Here, the record contains no evidence that any owner assessed under the LID failed to receive notice of the hearing. Each property owner, therefore, had ample opportunity to register its objections to the assessments and to any perceived defect in the notice or any procedure, as many did. Those who received notice of this opportunity should not be able to spurn it and potentially be able to raise constitutional challenges at some later date after the project is operating and its financing is in place. For these reasons, property owners other than the respondents have waived their due process challenges. The flaws in the notice described above, therefore, require only annulment of the respondents' assessments.

## SUMMARY OF HOLDINGS

¶86 We hold that procedural irregularities in the Council's vote to confirm the assessment roll did not render the ordinance invalid; that, except for the oversized pipes, the City did not err in assessing the entire cost of the improvements against the LID property owners; that the City's appraisal did not err by taking recent zoning amendments into account; and that the City showed that the mass appraisal method more fairly reflected special benefits than would the zone and termini method.

¶87 We also hold that the assessments were calculated on a fundamentally wrong basis because the City decided to finance excess capacity in the pipes through assessments on LID property owners who would receive no special benefit from that capacity. Further, we hold that approval of the final assessment roll was arbitrary and capricious for three reasons: (1) some protests were denied for failing to present evidence that the notice prohibited, (2) the requirement that each protestor present expert appraisal evidence was erroneous, and (3) the requirement that protestors prove that the assessments rested on a fundamentally wrong basis or were arbitrary and capricious was erroneous.

¶88 Finally, the City deprived property owners of due process because the period from the notice to the hearing did not reasonably allow property owners time to obtain the type of evidence demanded at the hearing and because the notice misled as to the type of evidence that could be presented. However, we hold that these due process claims were waived by all property owners other than the respondents.

¶89 For these reasons, we annul the special assessments imposed against respondents' properties.

JOHANSON, A.C.J., and PENOYAR, J. PRO TEM., concur.